(No. 49061.-

THE COUNTY OF COOK, Appellant, v. THE INDUS-
TRIAL COMMISSION *et al.*—(Claire Spiegel, Appel-
lee.)

*Opinion filed November 30, 1977.*

Bernard Carey, State's Attorney, of Chicago (Paul P. Biebel, Jr., Deputy State's Attorney, and Leonard N. Foster, Assistant State's Attorney, of counsel), for appellant.

Sneider and Troy, of Chicago (Gayle F. Haglund, Robert C. Morton, Ronald J. Nowicki, and Richard J. Troy, of counsel), for appellee.

MR. JUSTICE MORAN delivered the opinion of the court:

Respondent, the County of Cook, appeals the Cook County circuit court's judgment which confirmed the Industrial Commission's order awarding compensation to claimant, Claire Spiegel. Claimant is the widow of Albert Spiegel, a 63-year-old clerical worker who died from a heart attack on July 6, 1973. Spiegel, employed by the respondent in February 1971, worked at the statement counter in the Cook County treasurer's office. Prior to this employment, Spiegel had worked for 30 years as a supervisor for the Leader Laundry and Dry Cleaning Company. Mrs. Spiegel stated that during his employment with Leader her husband enjoyed good health.

In 1971, Spiegel was, on four occasions, hospitalized with a heart condition. After each hospitalization, he recuperated at home and returned to work, but he remained under medical supervision and took various types of medication on a daily basis.

According to Mrs. Spiegel's testimony, on Tuesday, July 3, 1973, her husband came home from work tired and he laid down to rest. The following day the Spiegels entertained relatives at their home, but, Mrs. Spiegel stated, there was no unusual excitement and her husband engaged in no physical activities. That afternoon Spiegel

excused himself and rested. He made no complaint about feeling ill. He retired that night at about 10 p.m., but awoke later that night and told his wife he did not feel well. Hospital admission records, introduced into evidence by respondent, indicate that Spiegel had developed chest pressure at about 11 p.m., July 4, and took nitroglycerine medication, which provided complete relief. At about 2 a.m. he awoke, the chest pressure having returned, and took another nitroglycerine tablet for relief. At 2:45 a.m., the pressure returned and he again took nitroglycerine, but this time the pressure did not go away. Spiegel was taken to the hospital and admitted as an emergency case with an "impending myocardial infarction."

On cross-examination Mrs. Spiegel testified that her husband had had some eye trouble, and further that he had to watch his weight, especially after he developed his heart condition; that he never complained of chest pains at any time during June or during the first few days of July; and that during the prior weekend he had not exerted himself or been involved in any stressful situations. Medical records introduced into evidence by the respondent revealed that Spiegel had been overweight and had had a history of hypertension, diabetes and mild glaucoma, but that the diabetes problem had been apparently cured and the weight problem had been brought somewhat under control.

Joseph Armato, head supervisor of the office where Spiegel worked, testified on behalf of the claimant that Spiegel was one of four or five men who sat at the statement counter to receive real estate tax bills from taxpayers who came into the office to make payments. It was Spiegel's job to add up the amount due, clip the adding machine tape to the bill, initial it, return it to the taxpayer, and direct him or her to the cashier's cage where the actual payment was made.

Monday, July 2, 1973, was the final day that

taxpayers could pay their first installments without incurring a penalty. Armato stated that this was their rush period, and that the counter men serviced an estimated 2,000 to 3,000 taxpayers each day during the week prior to the deadline. At the arbitrator's request, respondent produced records indicating the number of tax bills paid at the office during the final week. The records indicated that a total of 21,890 tax bills were paid: June 25, 2,705; June 26, 3,585; June 27, 3,619; June 28, 2,465; June 29, 5,394; July 2, 3,744; July 3, 378.

From time to time, Armato or his assistant would relieve the counter men so that they could take 15 minute breaks. Armato testified that he saw Spiegel on July 3, that he observed nothing unusual about Spiegel, and that Spiegel made no complaints. Armato noted that July 3 was a warm day, and that the men had to remove their jackets. Armato also said Spiegel was not a fast worker, but that he "kept up," and that all the counter men were fairly good workers.

Four of respondent's employees testified on its behalf. One witness testified that on July 3 Spiegel worked under her supervision transferring figures from tax statements onto small cards while seated at a desk. The witness described Spiegel as a slow worker, but stated that she did not push him. She also stated that six men had worked the counter on July 2. Another employee testified that only three men worked the counter. Several of the witnesses indicated that various employees, including themselves, assisted the counter men during the week when it was busy. Employees were also present to control the crowds, and if a taxpayer gave the counter men trouble, the men were to call their supervisor for assistance.

The office in which Spiegel worked was described as large, but not air conditioned. One witness stated that the office would become hot during the summer, even when the windows were open. Another witness, however, testi-

fied that during the preceding year he had not experienced discomfort due to heat, and said the men were not required to wear coats and ties.

In response to a hypothetical question describing Spiegel's prior heart condition, his work environment, and his work activities during the final week, Dr. William Fitzsimmons, claimant's medical expert, stated that in his opinion there could have been a causal connection between the facts stated and the hypothetical person's subsequent state of ill-being. He felt that such person would probably be predisposed to coronary artery disease and that the condition of work stress during the final week could have precipitated the heart attack.

On cross-examination Dr. Fitzsimmons stated that he had not examined any of Spiegel's medical records. After examining decedent's four 1971 hospital discharge summaries, Dr. Fitzsimmons testified that the information contained in the reports reinforced his opinion that the work stress might have precipitated the fatal heart attack. Dr. Fitzsimmons was then shown Spiegel's July 1973 hospital and medical reports, including the electrocardiogram and various enzyme tests. Dr. Fitzsimmons stated that, based upon his interpretation of the electrocardiogram and the enzyme tests, the onset of the myocardial infarction occurred sometime prior to Spiegel's admission into the hospital. On further cross-examination Dr. Fitzsimmons stated that the infarction could have been caused by many things, that the stresses on the job were one of many possibilities, and that Spiegel could have suffered an infarction even if he was not working.

Respondent did not introduce any expert testimony before the arbitrator, but on review before the Commission it offered the testimony of Dr. Henry Russe, a heart specialist. Dr. Russe testified in response to a hypothetical question that he could not assume the hypothetical person's death was causally related to his work activity. He

premised his opinion on the fact that there was no evidence in either the question asked or in the 1973 medical reports which would indicate that the hypothetical person had manifested symptomatology of the type that one would associate with stress, if stress had been a precipitating factor. Specifically, Dr. Russe stated that if a person had had a previous myocardial infarction, as had Spiegel, a new cardiac injury would have been signaled by an increase in chest discomfort and an increase in the use of nitroglycerine. He stated that, on the basis of the information presented to him, there was no suggestion that there was a remarkable increase in symptomatology, specifically pain, nor an increase in the use of nitroglycerine. An examination of decedent's 1973 medical records, however, reflects that in the treating physician's final summary, which was available to respondent's expert, the physician indicated that during the week prior to Spiegel's admission into the hospital Spiegel experienced increasing and unremitting anginal pain which progressed in a steady course. Respondent did not exclude these statements from his own exhibit, and they were, therefore, properly before the Commission and the arbitrator.

Dr. Russe agreed that an extended period of stress could cause psychic trauma, but stated that psychic trauma accounted for only a small percentage of acute myocardiac events. He further stated that a cardiac patient who engaged in physical activity to the point of cardiac tolerance would have a better long-range outlook than a patient who engaged in sedentary activities.

Dr. Russe specifically disagreed with Dr. Fitzsimmons' opinion that the onset of the myocardial infarction occurred prior to admission. Russe stated that if the cardiac event had occurred then, one would have expected declining enzyme levels rather than rising enzyme levels as indicated by the records. Based on his interpretation of the electrocardiogram and the enzyme tests, Dr. Russe opined

that Spiegel's cardiac injury was steadily progressing during his hospitalization.

Respondent contends that the Industrial Commission's conclusion that decedent sustained an injury arising out of his employment is against the manifest weight of the evidence. It argues that there is no direct evidence that decedent suffered emotional stress on the job, or that he manifested the symptomatology normally associated with stress and cardiac injury. It reasons that, absent such proof, the Commission's finding of causal connection must be deemed to have been based on mere speculation and conjecture. It further argues that the testimony of claimant's medical expert is equivocal and irrelevant in that it did not indicate that stress was the cause of decedent's heart attack, but only that it might have been or could have been.

Respondent recognizes that an employer takes his employees as he finds them (*Rock Road Construction Co. v. Industrial Com.* (1967), 37 Ill. 2d 123, 129), and that a compensable injury will be found on a showing that a preexisting illness was aggravated or accelerated by the employment (*Illinois Valley Irrigation v. Industrial Com.* (1977), 66 Ill. 2d 234, 240).

An accidental injury can be found to have occurred, even though the result would not have obtained had the employee been in normal health. (*Republic Steel Corp. v. Industrial Com.* (1962), 26 Ill. 2d 32, 43-44.) If an employee's existing physical structure gives way under the stress of his usual labor, his death is an accident which arises out of his employment. To come within the statute the employee need only prove that some act or phase of the employment was a causative factor of the resulting injury. *Wirth v. Industrial Com.* (1974), 57 Ill. 2d 475, 481.

The mere fact that an employee might have suffered a fatal heart attack, even if not working, is immaterial, for

the question before the Commission is whether the work that was performed constituted a causal factor. (*Laclede Steel Co. v. Industrial Com.* (1955), 6 Ill. 2d 296, 302-04.) The sole limitation to the above general rule is that where it is shown the employee's health has so deteriorated that any normal daily activity is an overexertion, or where it is shown that the activity engaged in presented risks no greater than those to which the general public is exposed, compensation will be denied. (*County of Cook v. Industrial Com.* (1977), 68 Ill. 2d 24, 32-33; *Rock Road Construction Co. v. Industrial Com.* (1967), 37 Ill. 2d 123, 127; *Illinois Bell Telephone Co. v. Industrial Com.* (1966), 35 Ill. 2d 474, 477.) Whether, however, the above factors are present is a question of fact for the Commission. *Okaw Homes, Inc. v. Industrial Com.* (1968), 40 Ill. 2d 81, 84.

It is not necessary for a medical witness to testify positively as to the cause of a heart attack. Such witness may testify in terms of "could have" or "might have" despite any objection that his or her testimony is inconclusive or speculative. (*Beloit Foundry v. Industrial Com.* (1976), 62 Ill. 2d 535, 539; *Clifford-Jacobs Forging Co. v. Industrial Com.* (1960), 19 Ill. 2d 236, 243-44.) It is the Commission's duty to determine the facts and to determine whether there was a causal relationship between the employment and the injury. (*Beloit Foundry v. Industrial Com.* (1976), 62 Ill. 2d 535, 539; *Chicago Tribune v. Industrial Com.* (1969), 42 Ill. 2d 476, 478.) Further, this court has consistently held that where medical evidence is conflicting as to causation, it is for the Commission to determine which testimony is to be accepted. *E.g., Illinois Valley Irrigation, Inc. v. Industrial Com.* (1977), 66 Ill. 2d 234, 241. See also *Avis Hotel v. Industrial Com.* (1968), 41 Ill. 2d 54, wherein there was a dispute as to when the myocardial infarction occurred.

Contrary to the respondent's assertion that the Commission's decision is based on speculation and conjecture,

we find that, even absent direct testimony, there was sufficient credible circumstantial evidence in the record from which a causal connection could be drawn. The evidence indicates that decedent had a preexisting heart condition, that the week preceding his death was one of the busiest times of the year in his office, that the counter men serviced an estimated 2,000 to 3,000 taxpayers each day during that week, and that the office became hot during the summer, even when the windows were open. It was the claimant's medical expert's opinion that the increased work activities could have precipitated the heart attack, and that this conclusion was further reinforced after examining the actual medical records. Even respondent's medical expert's testimony is probative of a causal connection when considered in light of the treating physician's final report introduced into evidence by the respondent.

This case is clearly distinguishable from those cases where the employee suffers a heart attack or stroke after walking four blocks (*Illinois Bell Telephone Co. v. Industrial Com.* (1966), 35 Ill. 2d 474), or after rising from a chair (*County of Cook v. Industrial Com.* (1977), 68 Ill. 2d 24), or after climbing a set of stairs (*D. Lelewer & Son v. Industrial Com.* (1965), 33 Ill. 2d 118). In those cases there was nothing to distinguish the work activity complained of from any other daily activity which was at least as stressful. Here, the Commission could have reasonably inferred that decedent was subjected to a greater degree of stress than that to which he was normally exposed, and that this stress constituted a contributing factor which accelerated his subsequent state of ill-being.

The Commission is entitled to draw reasonable inferences from both direct and circumstantial evidence. This court will not disregard those permissible inferences merely because other inferences might be drawn. *Beloit Foundry v. Industrial Com.* (1976), 62 Ill. 2d 535, 538-39.

Accordingly, we find that the Commission's decision was not against the manifest weight of the evidence. Therefore, the judgment of the circuit court of Cook County, confirming the Industrial Commission's award, is affirmed.

*Judgment affirmed.*