502

(No. 52779.—

COSTAS MAKRIS, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Nabisco, Inc., Appellee).

*Opinion filed November 18, 1980.*

Ronald S. Fishman, of Chicago, for appellant.

Braun, Lynch, Smith & Strobel, Ltd., of Chicago (Francis J. Lynch, of counsel), for appellee.

MR. JUSTICE CLARK delivered the opinion of the court:

This workmen's compensation case (see Ill. Rev. Stat. 1975, ch. 48, par. 138.1 *et seq.*) arose out of injuries sustained by Costas Makris on October 14, 1975. The parties stipulated that the only disputed issues before the arbitrator were whether the injuries were compensable under the Act, the nature and extent of those injuries, and the amount of compensation owed.

The portions of the arbitrator's award pertinent to this appeal were (1) that the claimant was entitled to re-

ceive "the sum of $149.20 per week for a period of 71 weeks, that being the period of temporary total incapacity for work, for which compensation is payable"; (2) that claimant should receive "the sum of $149.20 per week for a further period of 133½ weeks *** for the reason that the injuries sustained caused the permanent and complete loss of use of the right leg to the extent of 40% thereof; of the left leg to the extent of 15% thereof, and of the right arm to the extent of 10% thereof"; and (3) that the claimant was "entitled to have and receive from the Respondent the sum of $15,708.45, being the amount of compensation that has accrued from October 14, 1975, to February 8, 1978, and to the further sum of $3,995.60 for necessary medical, surgical and hospital services ***."

On review the Commission "affirm[ed] and adopt[ed] the decision of the arbitrator" but modified the first two findings excerpted above. The Commission said that claimant (1) was entitled "to have and receive from said respondent the sum of $149.20 per week for a period of 41 weeks (10/14/75 - 7/28/76), that being the period of temporary total incapacity for work, for which compensation is payable" and (2) was entitled only to 90 weeks of additional compensation, "for the reason that the injuries sustained caused the permanent and complete loss of use of the right leg to the extent of 30% thereof; of the left leg to the extent of 15% thereof; the Commission further finds that the petitioner sustained no permanent disability to the right arm." Claimant filed an appeal in the circuit court of Cook County, which confirmed the Commission's decision. Claimant has appealed to this court (see 73 Ill. 2d R. 302(a)), contending that the Commission's failure to find claimant permanently and totally disabled was against the manifest weight of the evidence and, alternatively, that the Commission's reduction of the arbitrator's award was against the manifest weight of the evidence. Claimant also contends that the Commission

erred in failing to award damages under sections 19(k) and 19(*l*) of the Act. See Ill. Rev. Stat. 1975, ch. 48, pars. 138.19(k), 138.19(*l*).

Claimant was injured on October 14, 1975, when he was caught and pinned between two garbage trucks, each approximately 10 feet long and 4 feet wide, which were moving along a conveyor belt. His body was pinned from the hips down for about one minute. He was taken by ambulance to a hospital and remained there for two weeks under the treatment of Dr. Richard Corzatt. A fracture of claimant's left leg required a cast, which was removed November 11, 1975. On December 16, 1975, according to a letter of Dr. Corzatt written to respondent and submitted on this record, "X-rays were obtained of the left leg which revealed the fracture along the proximal shaft of the fibula to be in good position. X rays obtained of the right leg revealed no bone or joint pathology." According to Dr. Corzatt, claimant "returned on Jan. 26, 1976, at which time he was complaining of pain in the right leg. X rays obtained of the right leg revealed no evidence of bone or joint pathology. There was evidence of vascular calcifications in the region of the anterior and posterior fibial vessels near the right ankle. He was given a muscle relaxant medication and advised to begin wearing a support hose for a sprain of the right calf *** and that he would be able to return to light duty work on Feb. 2, 1976." Claimant was last seen by Dr. Corzatt on March 23, 1976, when "X rays were obtained of the cervical spine, both shoulders, both hips and the right knee. They revealed no evidence of bone or joint pathology. He was instructed that he could return to full time employment" and that further care under [Dr. Corzatt's] orthopedic group was no longer necessary and that he should seek a medical work up under the care of his family physician." It was "not felt that [claimant would] have any permanent disability as a result from the accident sustained on October 15, 1975."

On March 17, 1976, claimant had been examined by Dr. Prem Pahwa, whose evaluations were submitted on the record by respondent. Dr. Pahwa examined claimant and opined that the left leg fracture had healed well, that "no objective findings except for a circumferential hypesthesia over the right leg extending to the abdomen, which does not fit in any neurological pattern," supported claimant's complaints of pain. He also found that the right shoulder "has a full range of motion with no areas of tenderness" and that claimant "should return to work as soon as possible."

On May 11, 1976, claimant was examined by Dr. Stamler, who, in a letter to claimant's attorney, stated the complaints of pain, and the results of tests of claimant's legs and right arm, and who recommended examination by a vascular surgeon due to "the absence of pulsation from the posterior tibial artery in the right leg." On June 11, 1976, claimant was again examined by Dr. Pahwa, who measured the results of an examination of claimant's lumbosacral spine and conducted low-back tests. He said it was very difficult "to evaluate motor power because the patient does not cooperate, but I do not believe there is any true motor weakness." He also said he believed there was "a great deal of functional overlay and there is no permanent damage caused by this injury and I believe he should return to work." On July 28, 1976, Dr. Pahwa, after another examination of claimant, stated that he was not "able to find any neurological deficits or vascular deficiency to account for [claimant's] continuing right leg pain. There are good pulses present bilaterally in the lower legs except for the posterior tibial pulses bilaterally. There is a stocking type of hypesthesia over the right lower leg up to the lower coastal margin and similarly, has a hypesthesia over the whole of the right upper extremity. These do not fit into any known pattern of neurological deficit. *** I certainly feel that no surgical

treatment is necessary. I also believe that there is a great deal of functional overlay in this patient."

Dr. Starkman, testifying for the claimant before the arbitrator, said he had examined the claimant in early July 1976 and had been an attending physician during claimant's hospitalization from August 16 to August 25, 1976. Dr. Starkman testified, *inter alia,* that claimant suffered a degree of right-foot dropping which, in his opinion, "very frequently is a permanent injury because of the poor outlook for that nerve generally speaking." Right-foot dropping is caused by "damage to the peroneal nerve as it goes around the head of the fibula." In Dr. Starkman's opinion, claimant would be hampered from performing manual labor which required claimant to stand on his feet all day, "but he might be able to perform it probably inadequately." The "inadequate" characterization was stricken from the record upon respondent's objection, the grounds for which were not stated. Claimant, however, has not preserved this ruling for review, and we therefore do not consider this matter further.

On December 20, 1976, claimant was seen by Dr. Pahwa, who reexamined the lumbosacral spine and conducted more low-back tests. He was "unable to feel the posterior tibial pulses bilaterally," "[t]he popliteal pulse [was] faintly palpable," "[t]here [was] good femoral pulsation bilaterally," and "no true motor weakness." He said that claimant complained of pain "with every motion of the foot and ankle," and had "a stocking type of hypesthesia over the right lower extremity"; "[t]he knee reflexes [were] present bilaterally, 'but' the ankle reflexes [were] diminished bilaterally." Dr. Pahwa's conclusions were:

> "On clinical examination, I am unable to determine the state of circulation of the right leg any further than mentioned above. Again, he [claimant] complains of circumferencial hypesthesia over the whole of the right leg, which does not fit into any known pattern of neurological deficit.

> Similarly, the patient complains of pain in the right shoulder. Clinically *** it appears to be normal."

Claimant was readmitted to the hospital on January 22, 1977. The report which was submitted on the record without pertinent objection, was not signed, but Dr. Christalis was listed as the consultant and Drs. Marks and Starkman were listed as attending physicians. Testing revealed no clinical explanation for claimant's pain.

On February 22, 1977, claimant was examined by Dr. Marshall Matz, who said:

> "In summary, we have a 56 year old man, who since October 14, 1975 has alleged pain about the shoulder, low back and both lower extremities and whose neurologic examination fails to reveal any objective findings that would explain his ongoing symptomatology. His EMG is also confusing from a clinical standpoint, as there are no findings to correlate with that laboratory test. In addition on his clinical examination there are a number of manifestations which weigh heavily against the diagnosis of organic disease involving the neuromuscular system. Particular reference is made to the sensory examination which is so bizarre as to raise questions regarding the patient's veracity. The type of injuries described should not produce this type and degree of complaints for this length of time and if there was involvement of the nervous system, one would certainly expect by this time to see some objective changes that would allow some sort of documentation from an etiologic standpoint. I have no further suggestions from a neurosurgical standpoint and can find nothing on the basis of my clinical examination of this date to preclude Mr. Makris from returning to his previous employment. I have not scheduled further appointments."

On this record, claimant's argument that he was entitled to a finding of permanent total disability is not well taken. The Commission's determination that the several physicians who said that claimant could return to work were correct is not against the manifest weight of the evidence. Nor is the supplemental evidence presented to the Commission, including additional medical opinions and the

claimant's testimony, so compelling as to result in a contrary result. When the experts disagree, the Commission must resolve that conflict, and its decision is generally not disturbed on review. *Johns-Manville Products Corp. v. Industrial Com.* (1979), 78 Ill. 2d 171, 178; *cf. County of Cook v. Industrial Com.* (1977), 69 Ill. 2d 10, 18.

Claimant also argues that the arbitrator's restrictive evidentiary rulings constituted error requiring the Commission's decision to be overturned. Any alleged error, however, was cured by the Commission on review of the arbitrator's decision. The Commission did not exclude any relevant information presented, and its decision, therefore, will not be disturbed on this basis.

We next consider the Commission's decision to eliminate the temporary total disability payments as of July 28, 1976, coincident with Dr. Pahwa's examination of that date. The arbitrator, in contrast, had ended those payments as of the date of Dr. Matz's diagnosis, on February 22, 1977.

The development of this case is best characterized as a contest between the credibility of claimant's subjective complaints and the various medical diagnoses. The term used by Dr. Pahwa to describe claimant's ailments, functional overlay, not explained on this record or causally related to claimant's injury, was an ambiguous and perhaps evasive diagnosis (see 3A R. Gray, Attorney's Textbook of Medicine pars. 80.52(4), 80.52(5) (1980)). Problems in interpreting this diagnosis and in evaluating claimant's complaints, in a case of this type, are best left to the skill and experience of medical experts and compensation administrators. (See 1B A. Larson, Workmen's Compensation sec. 42.24 (1980); *Veritone Co. v. Industrial Com.* (1980), 81 Ill. 2d 97.) A witness' credibility is likewise best resolved by the Commission. (*Health & Hospitals Governing Com. v. Industrial Com.* (1978), 72 Ill. 2d 263, 273.) Therefore, the Commission's decision to eliminate

temporary total disability payments as of July 28, 1976, is not against the manifest weight of the evidence.

For similar reasons, we will not reverse the Commission's reduction of the permanent disability percentages and the elimination of the disability award for the claimant's right shoulder. Dr. Corzatt never noted an injury to the right shoulder. Dr. Stamler could not connect claimant's right shoulder complaint to the injury. Dr. Pahwa's reports stated that there was nothing wrong with claimant's right shoulder. The other permanent disability percentage reductions are also supported by the evidence.

Respondent has requested, in its reply brief, a modification of the award so as to disallow the hospitalization expenses, arguing that the Commission could not have intended to allow hospitalization expenses during the period in which temporary total disability payments were denied. In the absence of a cross-appeal, however, this alleged error is not before us. See 73 Ill. 2d R. 303(a); *City of Chicago v. Industrial Com.* (1974), 59 Ill. 2d 284, 290; *Phelps v. Seeley* (1954), 3 Ill. 2d 210, 218; *Bryant v. Lakeside Gallaries, Inc.* (1949), 402 Ill. 466, 471.

Finally, we consider the Commission's failure to award penalties under sections 19(k) and 19(*l*) of the Act (Ill. Rev. Stat. 1975, ch. 48, pars. 138.19(k), 138.19(*l*)). Respondent only terminated the temporary total disability payments after it received expert medical opinions that claimant could return to work. (See Ill. Rev. Stat. 1975, ch. 48, pars. 138.19(k), 138.19(*l*).) In addition, the dispute over the amount of the award was legitimate; therefore the Commission did not err in refusing to assess a penalty. See generally *Mid-America Lines, Inc. v. Industrial Com.* (1980), 82 Ill. 2d 47, 61-62, and cases therein cited.

*Judgment affirmed.*