THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (M. Ellen Anctil, Appellee).

First District (Industrial Commission Division)   No. 1—85—3245WC

Opinion filed August 20, 1986

Patricia J. Whitten and Michael Cohen, of Chicago Board of Education, of Chicago, for appellant.

Ross Tyrrell, Ltd., of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Petitioner, M. Ellen Anctil, filed an application for adjustment of her claim after her husband, Lawrence P. Anctil, suffered a heart attack while working for respondent, the Chicago board of education. An arbitrator awarded petitioner $191.08 per week until $250,000 had been paid or 20 years had passed, whichever occurred later. The Industrial Commission affirmed the arbitrator's decision, and the circuit court of Cook county confirmed the decision of the Commission. Respondent appeals.

On November 10, 1981, decedent was 56 years old and was employed by respondent as a school custodian. Minutes after he finished moving a desk weighing 300 to 350 pounds up two flights of stairs he collapsed and died. Respondent contends that petitioner failed to establish that decedent died of a heart attack or that the death was causally related to his work activities.

George Jachowitz, a friend of decedent, testified that he helped decedent move the desk. Decedent picked Jachowitz up at 7 a.m., and decedent had one or two drinks of brandy in the Geguzis Tavern which was located in the Jachowitz building. According to Jachowitz, decedent very seldom went to the Geguzis Tavern in the morning, and visited the tavern approximately twice a month in the evening. Decedent smoked 1½ packs of filtered cigarettes each day.

The two men arrived at the school at 7:10 a.m. Jachowitz stated that the desk they moved was an old desk approximately 7 feet long and made of oak. The two men carried the desk from the basement to the second floor, taking 25 to 30 minutes to complete the task. They

held the desk about 2 feet off the ground as they carried it. Decedent was short of breath, requiring them to take frequent breaks. Jachowitz also stated that decedent did not complain of chest pain and was not perspiring. After finishing the chore, the men returned to decedent's office. Decedent was still short of breath, and they took several breaks while walking down the stairs. In his office, decedent sat down and then vomited twice. No blood was present in the vomit. He grabbed his chest and, slumping over against a file cabinet, cried, "I've had it." Jachowitz immediately called the paramedics.

The paramedics arrived approximately five minutes after decedent collapsed. Robert J. Landers, a Chicago fire department paramedic, testified that they found decedent barely breathing, without palpable pulse or blood pressure. He had cool skin, was cyanotic, and was perspiring. Landers stated that these were the "clinical signs of a heart attack." The electrocardiogram showed idioventricular rhythms, indicating that the heart was not producing a blood flow.

The paramedics unsuccessfully attempted to revive decedent over a 40-minute period. They were in communication with a physician, and under the doctor's orders they treated decedent with sodium bicarbonate, epinephrine, dopamine, isuprel, and administered cardiopulmonary resuscitation. Landers stated that a person with internal hemorrhaging could show the same type of arrhythmias as a person in cardiac arrest. He also stated that he could not definitively conclude whether heart failure was caused by a heart attack or by a different problem. Decedent was pronounced dead on arrival at the hospital, and the death certificate listed arteriosclerotic cardiovascular disease as the probable cause of death. No autopsy was performed.

Petitioner testified that her husband was 5 feet 7 inches tall and weighed 130 pounds. He was a social drinker who had one or two beers after dinner each evening, and had a cocktail when they went out for dinner or entertained at home. Decedent did not stop at a bar on the way home from work each day because he picked her up at the train every afternoon. On an average of once a week she and decedent went to the Geguzis Tavern, an establishment they had been frequenting as a couple for almost 40 years. In the few years before his death, decedent was in good health, and had not indicated that he was feeling ill. Petitioner noted that decedent's general duties at work included tending the boiler, cleaning the school building, and doing other odd jobs.

Dr. John I. Murphy, decedent's treating physician, testified for petitioner. In response to a hypothetical question, he stated that in his opinion decedent suffered a heart attack as a result of carrying the

heavy desk up two flights of stairs. His opinion was based on the clinical symptoms manifested and statistics showing that the primary cause of sudden death is heart attack. Dr. Murphy also stated that the drugs given by the paramedics were cardiac drugs, thus concluding that the doctor who ordered the drugs must have believed decedent was suffering a heart attack. Dr. Murphy stated that the clinical signs of a heart attack include chest pain, weakness, perspiration, shortness of breath and vomiting.

Dr. Murphy also testified that in 1972 decedent complained of chest pain but that his cardiogram was normal except for showing a slow heart rate. In 1974 decedent was treated for a duodenal ulcer, which was not caused by drinking. In 1974 a liver scan showed an enlarged liver, although no diagnosis of cirrhosis of the liver was made, nor was decedent ever diagnosed as being an alcoholic. In 1978, Dr. Murphy referred decedent to Dr. Scaramella, an ear, nose and throat specialist, for hoarseness. Dr. Scaramella's letter to Dr. Murphy included the comment that "[a]s you know, he drinks and smokes to excess." Dr. Murphy considered decedent to be a medium to heavy drinker, although he stated, "I don't know how much the man drank." Dr. Murphy cautioned decedent, as he tells all his patients, to stop drinking and smoking.

Dr. William B. Buckingham, an internist, testified for respondent. In response to a hypothetical question he offered his opinion that no causal connection existed between carrying the desk and the death, which was not the result of a heart attack. Instead, the death was most likely caused by a ruptured esophageal varices (a massive hemorrhage into the stomach which occurs as part of cirrhosis of the liver); or the "equally probable possibility" of Wernicke's polioencephalitis (a degenerative-disease process of the floor of the brain related to advanced alcoholism). He found no facts to support a diagnosis of arteriosclerotic disease, noting that decedent had a normal EKG nine years before his death. Dr. Buckingham based his opinion on the enlarged liver seen in the 1974 scan; the testimony that decedent was a moderate to heavy drinker; and the testimony that he did not mention chest pain at the time of his collapse.

Dr. Buckingham agreed that the liver scan contained no definite findings of cirrhosis of the liver, that decedent had never been diagnosed as an alcoholic, and that the paramedics did not treat decedent for either cirrhosis or Wernicke's disease. Dr. Buckingham also acknowledged that if the individual had extensive coronary disease, "it's possible that he could have had a myocardial infarction ensue as a result of the combination of the pre-existing disease and the unusual

physical, stressful activity." Dr. Buckingham stated that the clinical signs of a heart attack can include perspiring, vomiting, chest pain, and shortness of breath.

The arbitrator found that decedent's death arose out of and in the course of his employment and was causally related to physical stress exerted carrying the desk upstairs in the course of his duties. The arbitrator found Dr. Murphy's testimony "more persuasive than the testimony and speculative conclusions of Dr. Buckingham."

At the hearing on review sought by respondent, petitioner presented the deposition testimony of Dr. Gerry A. Smyth to rebut Dr. Buckingham's testimony. Dr. Smyth, whose practice consists mainly of treating and diagnosing cardiovascular disease, stated in answer to a hypothetical question that in his opinion the cause of death was cardiac arrest and the proximate cause for that cardiac arrest was the physical effort required to carry the oak desk. He stated that statistics show the overwhelming majority of people who die suddenly suffer from advanced arteriosclerosis. Dr. Smyth found that the prolonged physical effort involved in moving the desk would have "an extremely adverse effect on the heart in terms of increasing its workload and the demand for oxygen in the heart muscle." The strongest point in support of his opinion was the fact that the death occurred within minutes of the lifting.

Dr. Smyth found no facts to support a diagnosis of the esophageal varices because it would be a late manifestation of cirrhosis of the liver. There probably would have been blood in the vomit if a rupture of the esophageal varices had occurred. As to the enlarged liver finding in 1974, Dr. Smyth stated that it could have innumerable causes. Moreover, Dr. Smyth stated that with regard to Wernicke's Syndrome, which is common in alcoholics, sudden death is an exceedingly rare manifestation. Dr. Smyth said that nothing in the record indicated there was anything wrong with decedent's midbrain or hindbrain. Dr. Smyth concluded that the chances of cirrhosis of the liver causing death without preexisting symptomatology were less than one in a thousand. "This Wernicke's Syndrome, I can't conceive of that at all. I just wouldn't bring it up."

On review, in response to Dr. Smyth's testimony, respondent submitted a second evidence deposition of Dr. Buckingham. He maintained that his opinion as to the absence of causal connection and the cause of death was unchanged by Dr. Smyth's testimony.

The Commission affirmed the decision of the arbitrator. The circuit court of Cook County confirmed the decision of the Commission.

■■ ■ Whether an injury arises out of and in the course of em-

ployment is a question of fact to be decided by the Commission. (*Illinois Valley Irrigation, Inc. v. Industrial Com.* (1977), 66 Ill. 2d 234, 362 N.E.2d 339.) A reviewing court will not disturb these findings by rejecting permissible inferences or because different inferences might also be drawn, nor will it substitute its own judgment unless the findings are contrary to the manifest weight of the evidence. (*Illinois Valley Irrigation, Inc. v. Industrial Com.* (1977), 66 Ill. 2d 234, 362 N.E.2d 339; *Goldblatt Brothers, Inc. v. Industrial Com.* (1981), 85 Ill. 2d 172, 421 N.E.2d 909.) If an employee's existing physical structure gives way under the stress of his usual job duties, his death is an accident arising out of and in the course of his employment and the employee need only prove that some act of employment was a causative factor. (*County of Cook v. Industrial Com.* (1977), 69 Ill. 2d 10, 370 N.E.2d 520.) Thus, a preexisting heart condition does not preclude an award of compensation where the Commission may legitimately infer from the evidence that the employee's occupation was a causative factor in the death. (*Sears, Roebuck & Co. v. Industrial Com.* (1980), 79 Ill. 2d 59, 402 N.E.2d 231; *City of Chicago v. Industrial Com.* (1970), 45 Ill. 2d 350, 259 N.E.2d 5.) Moreover, it is for the Commission to resolve conflicting medical evidence. *County of Cook v. Industrial Com.* (1977), 69 Ill. 2d 10, 370 N.E.2d 520.

As set forth above, there is ample evidence in the record to support the Commission's decision. The testimony of Jachowitz showed the job-related duty required prolonged, excessive physical effort carrying a heavy oak desk up two flights of stairs over a 25 minute period. Dr. Murphy's and Dr. Smyth's emphasis on the clinical manifestations, the circumstances of death, the eyewitness testimony, the time factor between carrying the desk and death, the paramedic's testimony, and statistics regarding the causes of sudden death, strongly support their medical opinions regarding the cause of death. Although Dr. Buckingham presented contradictory testimony, it was for the Commission to resolve the conflicting evidence. The Commission's decision that petitioner established decedent died of a heart attack and that the death was causally related to his work activities is not against the manifest weight of the evidence.

Respondent's reliance on *Benson v. Industrial Com.* (1982), 91 Ill. 2d 445, 440 N.E.2d 90, and *Weers v. Industrial Com.* (1984), 126 Ill. App. 3d 786, 467 N.E.2d 586, is misplaced. In *Benson,* compensation was denied to the employee, a janitor who collapsed and died after removing 2-inch discs from a boiler with a heavy wrench and using vigorous scrubbing to clean the discs. Claimant's own medical expert testified that the death could well have been the result of a heart attack

caused by work duties, but he did not rule out an intercerebral disorder and noted that any form of exertion could cause death to a person with the cardiac condition the employee had been diagnosed as having. In *Weers*, compensation was denied to the employee, a painter who had collapsed and suffered a heart attack while painting at work. Petitioner was working on an unusually hot day but was not performing any work that was any more strenuous than usual. In the present case, minutes before his death, decedent was performing extremely unusual and very strenuous work. Additionally, petitioner's medical witnesses gave medical testimony in which they found a causal connection between his death and the work, and ruled out possibilities other than a heart attack as the cause of death.

For the reasons stated, the judgment of the circuit court of Cook County confirming the Commission's decision, is affirmed.

Judgment affirmed.

WEBBER, P.J., and LINDBERG, BARRY and KASSERMAN, JJ., concur.