PEDRO GALLEGO, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Greyhound Lines, Inc., Appellee).

First District (Industrial Commission Division)   No. 1—87—0255WC

Opinion filed March 16, 1988.

Louis G. Atsaves, of August M. Mangoni, Ltd., of Chicago, for appellant.

W. Daniel Leahy, of Roddy, Power & Leahy, of Chicago, for appellee Greyhound Lines, Inc.

JUSTICE WOODWARD delivered the opinion of the court:

Claimant, Pedro Gallego, sought workers' compensation benefits for two injuries allegedly sustained while working for his employer. The alleged injuries to claimant's hand occurred on April 5, 1980, and March 19, 1982. The cases were consolidated and heard before an arbitrator. Regarding both injuries, the arbitrator found that claimant was temporarily totally disabled and was entitled to reasonable and necessary medical expenses resulting from the accidents.

The Industrial Commission found that a causal relationship existed between claimant's injuries on April 15, 1980, and his condition of ill-being until March 15, 1982, but not thereafter. The Commission further found that claimant failed to prove that he sustained accidental injuries arising out of and in the course of his employment on March 19, 1982. The circuit court of Cook County confirmed the Commission's decision, and this appeal followed.

Respondent paid the claimant temporary total disability from April 15, 1980, to March 16, 1982. Claimant has not raised the issue of the extent of his permanent disability, and thus, we do not address this issue.

At arbitration, claimant stated that he had worked 12 years for the respondent at the time of the initial injury. He also testified that in 1975, he had suffered an injury to the fourth finger of his right hand. After a recovery period, claimant received a settlement under the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.1 et seq.).

On April 15, 1980, while working on a bus and standing in a pit full of oil and fuel to change a power steering filter, he slipped while climbing the pit stairs and struck the right side of his body on the ground, cutting his right hand on an oil drain. He cut the outer aspect of the dorsum of the right hand.

After reporting the injury to his foreman, claimant was taken to Henrotin Hospital and treated. Records of Henrotin Hospital dated April 15, 1980, show emergency room treatment to claimant's right

hand. Physical examination records noted swelling of the right hand on the dorsal aspect at the fourth metacarpal bone with superficial lacerations on the ulnar aspect of the right hand.

The following day, claimant saw a physician at the Elston Clinic for treatment of his right hand. The Elston Clinic referred claimant to see Dr. Geline, who saw him on April 22, 1980. Dr. Geline found a 3-cm. traverse laceration of the ulnar side of the right hand with some swelling on the dorsum of the hand in the region of the fourth metacarpal. The fourth and fifth fingers were somewhat stiff, with the patient holding them together voluntarily. The doctor's impression was contusion and laceration of the right hand. A follow-up examination on April 29, 1980, showed no improvement, with considerable guarding of motion of the fourth and fifth fingers. A course of physical therapy was advised.

Another examination on May 6, 1980, revealed persistent and gross restricted motion of the fourth and fifth fingers. At this time, Dr. Geline recommended a period of immobilization of the right hand.

Dr. Geline released claimant to return to work in mid-May 1980. At that time, claimant still experienced considerable pain in his right hand, and he visited Dr. Raidbard. On May 15, 1980, claimant was admitted into Grant Hospital, where he came under the care of Dr. Shahan Sarrafian, an orthopedic surgeon.

Principal diagnosis upon admission to Grant Hospital was soft tissue injury to right dorsal margin and upper right ulnar sheath; injury to the right hand; chest wall contusion with associated abdominal tenderness and trauma right hand with healed superficial lacerations laterally.

Veronica Douglas, a physical therapist at Grant Hospital, testified that she treated claimant for dysfunction of his hand beginning in May 1980. He had little or no use of the fingers of his hand at that time.

On June 2, 1980, Ms. Douglas noted a pronounced hard swelling (edema) of the dorsum of the ulnar side which was very inflamed and warm to touch. There was no active range of motion in the little or ring fingers. Vibration therapy to disperse the edema commenced on July 14, 1980. On September 24, 1980, Ms. Douglas noted claimant to be very confused about conflicting medical advice.

In or about September 1980, claimant went to Presbyterian-St. Luke's Hospital for a second opinion regarding his hand. There he was under the care of Dr. Robert Schenk, whose treatment of the injury included the injection of steroids into the affected area of the hand and immobilization of the affected fingers, treatment not ad-

vised by Dr. Sarrafian. Dr. Schenk was evidently claimant's primary physician until May 1981, at which time claimant returned to the care of Grant Hospital staff.

At arbitration, Ms. Douglas testified regarding the effect of two different hand specialists treating the claimant:

> "My opinion at that time (June 1981) was that there had been a lot of confusion in the handling of his case that had been very unfair to him, and had he stayed with us instead of being taken away and being brought back again he would have continued to improve."

In May 1981, Dr. Sarrafian performed surgery on the claimant's hand; the surgical procedure consisted of the excision of thick, fibrous tissue from the dorsal aspect of the right hand and the extensor tendon sheath. This procedure was followed by tenolysis and neurolysis.

Subsequent to the surgery, Ms. Douglas saw claimant on June 3, 1981, and noted a delay in healing of the wound. This delay could have been natural. On June 8, 1981, fresh blood was noted on the dressing of the right hand. On June 15, 1981, Ms. Douglas found the wound to be less healed, and there was some fresh bruising on the dorsum of the hand. On July 6, 1981, a fresh hematoma was noted around the operation site. By July 22, 1981, Ms. Douglas noted better progress.

On January 22, 1982, Ms. Douglas noted that the bump on the right hand appeared larger, with an appearance of having been traumatized recently. Claimant insisted that he had not hurt himself.

On January 29, 1982, Dr. Sarrafian told claimant that it was probably time for him to return to work. This view was contradicted by the fact that claimant still did not have sufficient hand strength or was sufficiently pain free to perform his former work of repairing buses. Further, claimant's condition seemed to be deteriorating rather than improving.

On March 2, 1982, Ms. Douglas visited the Greyhound depot and in consultation with respondent noted three jobs that claimant could perform with minimal use of one hand: driving a forklift, driving the cleaning truck, and the driving of buses around the garage.

On March 5, 1982, claimant was seen again by Ms. Douglas. He appeared with a grossly edematous forearm. From the elbow down, his arm was extremely swollen with pitting edema. Claimant was asked to remove his shirt, and Ms. Douglas observed an area of approximately three inches just proximal to the elbow joint, bound torniquet style to produce edema. Ms. Douglas opined that this was self-inflicted. Claimant then saw Dr. Sarrafian, who confronted him

regarding the condition of his right arm and hand. Claimant denied binding his arm.

On March 10, 1982, claimant was again seen by Ms. Douglas. At that time, there was no edema in the forearm, but a one-inch bruise and a reddened swelling of the radial side of the dorsum of the right hand. Ms. Douglas opined that the cause of claimant's regression was due to repeated reinjury and from something being wrapped around his arm very tightly to cut off the circulation.

At arbitration, Dr. Sarrafian testified that on January 25, 1982, he found a recurrence of the intermittent swelling of the dorsal radial side of the hand with no swelling on the dorsal ulnar side. He further stated that on March 5, 1982, he noted transverse constriction marks about the right mid-arm, four fingers breadth in width, which were ecchymotic with marked swelling from the marks to the distal point involving the forearm and dorsum of the hand. His impression was that there was some form of constriction applied at the mid-arm interrupting the venous and lymph flow in the upper extremity.

Dr. Sarrafian testified that he last saw claimant on March 15, 1982, at Grant Hospital. At that time, the doctor examined claimant's upper right extremity. He noted on the right hand swelling of the dorsal radial with a new area of ecchymosis. The ulnar dorsal aspect of the hand was not swollen. Three circular striation marks were still present on the right arm. Dr. Sarrafian instructed claimant to return to work as of March 16, 1982. The doctor felt that there was a relationship between any form of constriction which was applied on the mid-arm and edema he observed in the right forearm and hand.

As to whether the constriction noted on the forearm aggravated or contributed to the condition of ill-being, Dr. Sarrafian opined that it consisted of more swelling in the hand and slowed down the recovery process from the Secretan's Edema, a hard edema of the dorsum of the hand. He further stated that recovery from Secretan's Edema is a "slow process with high chance of recurrence."

Dr. Sarrafian admitted that Dr. Secretan, after whom the disorder is named, instructed physicians not to interfere (operate) on the condition because that might cause a chronic ulcer. The doctor was unable to formulate a medical opinion as to what percentage of the edema had been caused by self-induced trauma or constriction.

Claimant testified that he returned to work for respondent on March 16, 1982. At that time, he noticed pain in his right arm from the fingers all the way to the shoulder. He was assigned a cleaner job which involved mopping, cleaning windows, installing hoses on bus washrooms, and using a brush with one hand. After finishing that

day, claimant stated that he noticed a lot of pain in his right arm. On March 17, 1982, claimant performed the same work, noticing that he was experiencing significant pain in his right arm.

Claimant then testified that on March 19, 1982, he reported to work. He then stated that at approximately 10 a.m. while cleaning a bus toilet, a hose he was using swung out and struck his right hand, causing great pain and swelling. He reported the pain in his right hand to his supervisor, Ernie Kasten. Kasten did not ask the cause of the pain, and claimant did not volunteer that information. Later in the day, claimant went to Elston Clinic for an examination of his right hand. The report, which was subsequently sent to respondent, stated that "[O]n 3/19/82 at 10:30 a.m., patient states, 'At work I injured my right hand while connecting rubber hose to back of bus.' "

Claimant did not return to work after this alleged incident. Respondent terminated his employment on April 15, 1982, due to his alleged falsification of a workers' compensation claim and his continued absence from his employment.

Claimant subsequently came under the treatment of Dr. Prem Pahwa. On June 4, 1982, Dr. Pahwa noted extensive swelling over the dorsum and thenar eminence of the right hand with discoloration over the dorsum of the hand and no specific signs of acute infections. A healed surgical incision measuring 5½ inches over the dorsum of the hand was found with tenderness over the hand and indurations over the dorsum of the hand and a lack of extension of the proximal interphalangeal joint of the index finger. There was also a lack of 15° extension of the ring and middle fingers and 30° lack of extension of the little finger. The pinprick sensation over the right middle, ring, and little fingers and the dorsum of the right hand was diminished. The right hand measured 10¼ inches and left 9¾ inches. Grip of right hand was weak, and claimant was unable to make a fist. Dr. Pahwa saw claimant again on July 23, 1982, and September 18, 1982, and referred the patient to see Dr. Boonmee Chunprapaph.

Dr. Chunprapaph, an orthopedic surgeon with a fellowship in hand surgery, testified at the evidence disposition that he first saw claimant for treatment on October 12, 1982. On that date, the doctor noted tremendous swelling over the whole right hand and all the fingers discolored with redness. Old X rays were reviewed and further examination noted a very stiff finger. Dr. Chunprapaph's initial impression was reflex sympathetic dystrophy. He felt that this condition could be due to the overfunction of the sympathetic nerve. He also thought that exercising the hand could worsen the condition and cause more scarring. In his view, the hand should be used but not forced, due to

the fact that increased use of the hand could cause increased stiffness.

Dr. Chunprapaph placed claimant's right arm in a short cast to confirm some of his findings and to see if the swelling in the right hand would diminish. The cast was worn for three weeks, after which time it was removed. The doctor then noted that the right forearm was not swollen as before but that the right hand and fingers were still swollen.

According to Dr. Chunprapaph, swelling of the right hand can be due to many causes, such as not elevating the hand and sleeping with the hand underneath the head. He opined that it would be very hard for the patient to be found malingering. He could not completely say that claimant induced the swelling, but felt it was not proved whether he had or had not induced the swelling. During the last examination in April 1983, Dr. Chunprapaph noted no changes in the right hand. Claimant still had stiffness in the right hand.

As to any evidence of self-induced edema, the doctor stated:

"Q. On your last examination, did you notice any evidence of self-induced edema?

A. I can't say 100 percent.

Q. Did you notice any evidence?

A. I can't tell. This has to be observed in the hospital. The best way, keep the patient in the hospital under 24 hour observation, and then you can find whether the patient did it or not."

The physician further stated that he did not know whether or not surgery would help claimant, and he cited a divergence of medical opinions as to the value of further surgery.

At the time of his last examination, Dr. Chunprapaph was still not satisfied as to the course of claimant's problems with his right hand and thought that claimant could not return to his previous type of work.

On cross-examination, Dr. Chunprapaph readily admitted that Secretan's edema has been diagnosed in cases where individuals have been suspected of self-inducing injury. He stated that the notes he received from Dr. Pahwa made no mention of self-induced injury.

In answer to a hypothetical question, Dr. Chunprapaph stated that tying a band tightly around a patient's arm prior to an examination could cause or aggravate swelling of the hand. The doctor recommended hospitalization to determine the cause of the swelling. On redirect examination, Dr. Chunprapaph stated that when a band wound around the arm was removed, the swelling would slowly decrease. If such a band were placed on the arm once, it would cause temporary

swelling; if many, many times, the swelling could become permanent due to scar tissue.

Dr. Thomas Marquardt examined the claimant on August 9, 1982, at the respondent's request. He noted "very severe, gross edema of all digits of the right hand" extending all the way to the wrist. He also observed, "From the wrist proximally, for approximately 8 cm., there is noted to be circumferential red, irritated striations consistent with recent constriction of this area." In concluding his clinical impressions, Dr. Marquardt stated, "There is every reason to believe, based on the physical examination of today, that this patient is self-abusing his own hand. It appears that he is, in fact, applying tourniquet just above the right wrist which accounts for the gross edema which is present."

Dr. William Stromberg, appearing for the respondent, testified that he saw claimant for an examination on December 22, 1983, and issued a report dated February 6, 1984. Objective findings consisted of a marked swelling of the entire right hand starting at the wrist, an almost fixed position of the thumb and fingers. A well-healed scar was noted over the dorsum of the right hand with fingers flexed with an inability to open or extend the fingers. No marking over the forearm or wrist indicating application of a recent bandage was found. Diagnosis was marked edema of the right hand. The doctor examined certain medical records at the time of the examination, but did not have such records present at the time he testified.

Dr. Stromberg testified in response to a hypothetical question that the condition of ill-being found in his examination of claimant on December 22, 1983, and his report dated February 6, 1984, was causally related to both the incidents of April 15, 1980, and March 19, 1982. He opined that claimant started out with Secretan's Disease, which was limited only to the dorsum of the hand, and felt that the only way to get swelling of the entire hand, dorsal, volar, lateral, radial, and ulnar, would be to constrict the return circulation of the arm from the hand. Dr. Stromberg thought that the condition noted could be related to any of the two injuries claimant had, plus constriction of the arm that would restrict the return of circulation. He stated that repeated injury and wrapping of the arm or any part of the extremity would produce irreversible damage to the hand and there is no way of determining in December 1983 the extent of the injury from April 15, 1980. He further stated that there was no way of getting fixed edema out of a hand.

On cross-examination, Dr. Stromberg stated that he was aware of three or four suspect constrictions and that his opinion would change

if only one suspected constriction of the forearm was noted, and he also admitted finding no markings over the forearm during his examination. The doctor further stated that the cause of Secretan's edema is unknown but usually secondary to some injury. .

Hospital records for an admission on May 30, 1984, from the University of Chicago Hospital were admitted on review. The discharge date was June 3, 1984. Notes reveal that the patient would be unable to work for the next six months. No notations of any evidence of self-abuse were made.

Claimant initially argues that the Commission's findings that his conduct precluded further temporary total disability benefits after March 15, 1982, is against the manifest weight of the evidence and contrary to law. Claimant specifically cites as erroneous the Commission's finding that "petitioner persisted in self-inflicted injurious practices which have imperiled and retarded his recovery, specifically interfering with circulation of the right to the hand," and "there is no medical evidence tending to contradict these conclusions."

Claimant contends that the record contains no evidence of his persisting in injurious practices and that the only evidence of any constriction of the right arm and hand occurred on March 5, 1982. Claimant notes Drs. Sarrafian and Stromberg both testified that repeated constriction of the blood flow is necessary to the persistence of Secretan's edema. Dr. Stromberg indicated that his opinion regarding the etiology of claimant's continuing hand problems would change if there had been only one instance of constriction.

Further, claimant argues that the Commission's findings regarding self-induced reinjury of the hand are contradicted by the evidence. The Commission found that "as early as June 8, 1981, Douglas began signs of reinjuring of the hand." Douglas testified that on June 8, 1981, there was fresh blood on the dressing, and she thought the hand was reinjured but cited no other reason for the presence of blood. Claimant points out that Dr. Sarrafian testified that a chronic ulcer could develop after surgery. He also testified that by June 8, 1981, 90% of the area operated on was healing.

Claimant also argues that Veronica Douglas' testimony does not support the Commission's conclusion regarding the constriction of his arm. Douglas testified that she saw petitioner on January 17, 1982, after a two and one-half month absence. She noted pronounced soft swelling on the radial side of the right hand, and the swelling on the ulnar side of the hand "looked excellent." She did not indicate any findings or suspicions of trauma on that occasion.

On February 5, 1982, Douglas observed that the bump on the

hand appeared larger than ever and had the appearance of being traumatized recently. Petitioner denied that he had reinjured the hand. On March 5, 1982, Douglas found a grossly edematous forearm and observed three striations near the elbow which indicated binding by a tourniquet. Again, petitioner denied binding his arm. On March 10, 1982, Douglas observed no edema in the forearm but did note a small bruise and reddened swelling on the radial side of the right hand's dorsum.

Respondent argues that it is impossible to document intentional self-infliction of injury unless the patient is under observation 24 hours per day. However, respondent contends that Drs. Geline and Sarrafian and Ms. Douglas were suspicious as to the cause(s) which delayed recovery. Respondent points to the following evidence in support of its contention that the Commission's decision was not against the manifest weight of the evidence. As early as May 14, 1980, Dr. Geline noted persistent gross restriction of the fourth and fifth fingers and suggested that the patient remained a difficult therapeutic management problem. The records of Dr. Sarrafian indicate that on June 29, 1981, and July 6, 1981, there was evidence of possible recent trauma to the dorsum of the right hand with subcutaneous hematoma. On July 20, 1981, there was again evidence of fresh marginal bleeding.

The records of Ms. Douglas show that on January 22, 1982, she noted a prominent soft swelling on the radial side of the hand which was red and irritated. On January 29, 1982, she commented that the situation was deteriorating rather than improving. On February 5, 1982, the bump on the hand was larger than ever and appeared to have been traumatized recently. On March 5, 1982, she noted the circumference of the right arm to be 1½ inches greater than the left and at this point, after asking claimant to raise his sleeve, noted the striation marks from apparent constriction of the right arm. These same observations were made by Dr. Sarrafian after claimant was escorted into the cast room, with the doctor noting a peculiar clinical picture of transverse constriction marks about the midarm on the right side and width of the constricted area about four finger breadths. At this point, Dr. Sarrafian indicated there was no question that there was self-induced pathology.

A reviewing court will not disturb the Commission's decision unless it is against the manifest weight of the evidence. *Luckenbill v. Industrial Comm'n* (1987), 155 Ill. App. 3d 106.

■■ ■ We find this evidence, coupled with the testimony and reports of Drs. Stromberg and Marquardt, is sufficient to support the

Commission's finding that claimant was retarding his recovery. As such these actions by claimant constitute an independent intervening cause which breaks the chain of causation between a work-related injury and ensuing disability or injury. (*International Harvester Co. v. Industrial Comm'n* (1970), 46 Ill. 2d 238.) Further, when a worker inflicts injury to his person for the purpose of collecting compensation, such an injury is not an "accidental injury" and, therefore, not compensable. (*Harper v. Industrial Comm'n* (1962), 24 Ill. 2d 103.) The evidence is sufficient to support respondent's contention that the claimant's right hand problems were as of March 16, 1982, no longer the result of accidental injuries and, consequently, not compensable.

We also note that claimant presented no evidence that the apparent incidents of trauma to or constriction of the right hand did not result from intentional acts. In light of the treating physicians' and the therapist's opinions, the failure of petitioner to explain said trauma and constriction further erodes his position.

Next claimant argues that the circuit court's confirmance of the Commission's finding that claimant failed to prove he sustained accidental injuries on March 19, 1982, is against the manifest weight of the evidence.

Claimant is correct in asserting that respondent was on notice of claimant's alleged hand injury. If respondent was not on notice of the alleged injury on March 19, 1982, it was subsequently informed of the injury by the Elston Clinic's report. The issue thus is not notice to employer but whether an accident took place on the date in question.

Claimant stated that on March 19, 1982, at approximately 10 a.m., he reinjured his right hand when a hose struck the dorsum of the hand. He contends that the Elston Clinic report of March 25, 1982, supports his testimony. Claimant further contends that James Jones, manager of the respondent's garage, admitted that sometime during the date in question he was informed by claimant of the injury.

Claimant also asserts that he was returned to work because his treating physician, Dr. Sarrafian, believed no further benefit could be gained from continued rehabilitation. Claimant characterizes his return to work on March 17, 1982, as a "cruel joke" played on an employee with a severely injured hand. Claimant argues that respondent knew of his condition and must "take him as they find him." *County of Cook v. Industrial Comm'n* (1977), 69 Ill. 2d 10.

Respondent counters that claimant's argument ignores the element of his credibility and asserts that the Commission had ample opportunity to question claimant's veracity. Respondent opines that the Commission considered the condition of the hand as the result of

chronic and intentional self-abuse and weighed that against the likelihood of having further damage done by being struck by a hose approximately the size of a garden hose.

■■ ■ Credibility determinations and reasonable inferences are for the Commission to judge. (*Lemons v. Industrial Comm'n* (1987), 155 Ill. App. 3d 125.) It is clear that the Commission found claimant's credibility wanting and, thus, did not believe that claimant had incurred a debilitating hand injury on March 19, 1982. We will not reverse the Commission's decision, as it is not our province to substitute our judgment for that of the Commission on questions of credibility. *Interlake, Inc. v. Industrial Comm'n* (1983), 99 Ill. 2d 69.

Accordingly, we uphold the circuit court's affirmance of the Commission's decision in this case.

Affirmed.

BARRY, P.J., and McCULLOUGH, McNAMARA, and CALVO, JJ., concur.