ASSOCIATES CORPORATION OF NORTH AMERICA *et al.*, Appellants, v. THE INDUSTRIAL COMMISSION *et al.* (Mary L. McDonnell, Widow of George F. McDonnell, Deceased, Appellee).

First District (Industrial Commission Division)   No. 1—87—0153WC

Opinion filed January 27, 1988.—Rehearing denied May 15, 1988.

Michael E. Rusin, of Stevenson, Rusin & Friedman, Ltd., of Chicago, for appellants.

Chester J. Maciorowski, Richard F. O'Malley, Jr., and Alan R. Dolinko, all of Chicago (Sidley & Austin, of counsel), for appellees.

JUSTICE CALVO delivered the opinion of the court:

Claimant, Mary McDonnell, filed an application for adjustment of claim under the Workmen's Compensation Act (Ill. Rev. Stat. 1975, ch. 48, par. 138.1 *et seq.*), alleging that her husband's death arose out of and during the course of his employment with Associates Corporation of North America. After a hearing at which evidence was submitted on the merits of the claim, the arbitrator denied benefits on the ground that the Industrial Commission lacked jurisdiction. The Industrial Commission affirmed the arbitrator but was reversed by the circuit court. No appeal was taken from this judgment. On remand, the Industrial Commission awarded claimant $78,766 per year for each of four years remaining on his employment contract, $769.23 per week pursuant to section 7(a) (Ill. Rev. Stat. 1975, ch. 48, par. 138.7(a)), and $1,750 for burial expenses pursuant to section 7(f) (Ill. Rev. Stat. 1975, ch. 48, par. 138.7(f)). The Industrial Commission further found that Associates Corporation of North America

was the decedent's employer at the time of death. The circuit court confirmed the Industrial Commission's findings. The employer appeals. The facts are as follows.

George F. McDonnell, the decedent, entered into an employment contract in Indiana with Associates Corporation of North America, a Texas corporation, to coordinate and direct its various insurance companies, including the Providence, Rhode Island-based Providence Washington Insurance Company. On May 13, 1976, while on a business trip to Providence, Rhode Island, Mr. McDonnell suffered an acute myocardial infarction which caused his death. Mr. McDonnell, who was 49 years old at the time of death, was a resident of Illinois during the entire period of his employment contract.

The decedent's job required that he travel extensively. The employer acknowledges that during the year prior to his death, the decedent spent 58 working days in Providence, Rhode Island, 37 working days in South Bend, Indiana, 7 working days in New York, New York, 20 days in other cities, and 55 days traveling from one city to another. This is a total of 177 days.

Claimant testified that on several occasions during the previous year the decedent held business meetings in an office located in the master bedroom of their home. Furthermore, decedent received business mail at his home address. Although the decedent had phone numbers where he could be reached in Providence and South Bend, claimant testified that she received 5 to 7 business phone calls per day on decedent's telephone in their home. She would take messages from those calling and relay these messages to decedent when he called her. Claimant would often type memos for the decedent which decedent would take with him on his travels.

Paul J. Ochs, who was president of Providence Washington Insurance Company from approximately May 1, 1975, through the date of the decedent's death, testified in an evidence deposition that he became acquainted with the decedent shortly after Ochs became president. Ochs stated that decedent, as vice-chairman of the board of Providence Washington, was his superior. When Ochs needed to contact decedent, he did so by either phoning or writing decedent at his home in Wilmette, Illinois. Although Ochs had office space and secretarial services set aside for decedent's use, the decedent had neither a permanent office nor secretary in Providence. According to Ochs, the decedent received very little business mail at the Providence office. Ochs testified as follows regarding the days immediately prior to May 13, 1976.

On May 3, 1976, Ochs met with the decedent at the decedent's

home in Wilmette, Illinois, to prepare a presentation for Associates and its parent company, Gulf & Western. The purpose of this presentation was to show that Providence Washington had corrected its serious problems under the leadership of decedent and Ochs and that it had become a viable entity. According to Ochs, the decedent related at this time that decedent felt he was under pressure and that he was concerned about being "pushed out" of his job.

On May 10, 1976, the decedent met with Ochs at the Providence Washington offices in Providence, Rhode Island, to continue preparation for the presentation. Ochs testified that he and the decedent were determined to finish their preparation during this week since they were not going to see each other again until the date of the presentation, approximately 2 weeks hence. The May 10 meeting began early in the afternoon and lasted until sometime after 6 p.m. The following morning, May 11, they met at the office and continued their preparations until late in the afternoon. They continued working over dinner, finishing up about 9 to 9:30 p.m. On May 12 they met at the office at about 8:30 a.m. and worked until 5 or 6 that evening. They did not eat together that night.

At approximately 8:30 a.m. on May 13 the decedent called Ochs at the office, told Ochs that he was not feeling well, and asked Ochs to come and see him in his room as soon as possible. Ochs left the office immediately, and when he arrived at decedent's hotel the decedent was pacing around the room. The decedent told Ochs that he had not been sleeping well lately and that he had an intermittent pain in his right arm which he had had since arriving in Providence. When Ochs asked decedent whether he had a medical problem, the decedent told Ochs that his annual physical had found high blood pressure, which was now under control, and that his physician had told him to slow down and lose weight. Ochs stated that decedent had lost a considerable amount of weight during the last couple of months. During this conversation Ochs noted that the decedent was belching frequently.

Upon expressing concern, Ochs obtained the name and phone number of decedent's physician from decedent. When Ochs called the physician, the physician was busy at the hospital. Ochs then called the decedent's wife, who was not at home. Ochs then called the house physician, Dr. Jacob Stone, and described the decedent's symptoms over the phone. The physician told Mr. Ochs to bring the decedent to his office immediately.

On the way to Dr. Stone's office, Ochs related that the decedent was deteriorating considerably. Upon arrival at approximately 10

a.m., Dr. Stone gave decedent an electrocardiogram and determined that decedent was having a heart attack. An ambulance came to take decedent to the hospital.

Dr. Stone's report tells the rest of the story. Upon arrival at the hospital, the decedent vomited over 100 cc's of bright red blood and his blood pressure dropped from 120/80 to 70 systolic. The decedent had repeated episodes of ventricular tachycardia, alternating with "wandering QRs complexes." Despite extensive treatment, the decedent developed a third-degree heart block which, ultimately, resulted in death that same day. A subsequent autopsy disclosed that the decedent suffered from severe arteriosclerotic heart disease. The cause of death was officially listed as acute myocardial infarction.

Claimant testified that the decedent was diagnosed as having a heart problem in February 1976. His physician prescribed pronestyl and a diet. Claimant testified that decedent had lost about 20 pounds during the four months prior to his death. Although claimant was unaware of any heart problems of decedent prior to February 1976, she remembered that he had a duodenal ulcer which was treated in 1973. She noted that decedent was encouraged by his medical reports and was "looking good" when she saw him walk into O'Hare Field on May 3, 1976.

Dr. Dragic Obradovic, the decedent's cardiologist, testified that on February 6, 1976, he diagnosed decedent as suffering from mild coronary heart disease. He prescribed nitroglycerine and rest to control the chest pains and pronestyl to eliminate extra heartbeats. When Dr. Obradovic last examined decedent on April 2, decedent had minimal symptoms. He told decedent to contact him if decedent experienced any symptoms. Near the end of April, decedent called Dr. Obradovic, stating that he was under a great deal of stress at work and that his chest pains were becoming more frequent. Dr. Obradovic told decedent to come and see him as soon as possible so decedent's course of therapy could be reevaluated. Using the New York Association Classification of Cardiovascular Disease, 1 (least severe) to 4 (most severe), Dr. Obradovic rated decedent a "1."

During an evidence deposition, claimant propounded a lengthy hypothetical question to Dr. Nathaniel Greenberg, a specialist in internal medicine, which solicited his opinion as to the cause of the acute myocardial infarction which caused decedent's death. This question asked Dr. Greenberg to assume, *inter alia*, (1) the favorable reports of physicians in April 1976, (2) that decedent felt he was being pushed out of his job, (3) that decedent appeared to be in much better health in May 1976 than he had during the months immediately

previous, and (4) that decedent occasionally suffered angina pains. Dr. Greenberg testified on the basis of these and other assumptions that he believed that occupational stress caused excessive reactivity of the blood vessels which, in conjunction with the arteriosclerosis, caused the acute myocardial infarction which caused decedent's death.

On appeal the employer alleges that the Industrial Commission lacked jurisdiction to hear the claim. Alternatively, the employer alleges (1) that the Industrial Commission's determination was based upon incompetent evidence, (2) that the Industrial Commission erred in not allowing the employer to elicit additional evidence on remand, (3) that the Industrial Commission's determination that decedent's death arose out of and during the course of his employment is contrary to the manifest weight of the evidence, and (4) that the Industrial Commission's determination that decedent was neither an employee nor a loaned employee of the Providence Washington Insurance Company is contrary to the manifest weight of the evidence.

■ We note at the outset that the jurisdictional issue in this case was properly appealable after the circuit court ruled that the Industrial Commission had jurisdiction over this claim. (See *Patton v. Industrial Comm'n* (1986), 147 Ill. App. 3d 738, 498 N.E.2d 539.) We will nonetheless discuss the merits of this issue.

Section 1(b)(2) of the Act provides:

"2. Every person in the service of another under any contract of hire, express or implied, oral or written, including persons whose employment is outside of the State of Illinois, where the contract of hire is made within the State of Illinois, persons whose employment results in fatal or non-fatal injuries within the State of Illinois where the contract of hire is made outside of the State of Illinois, and persons whose employment is principally localized within the State of Illinois, regardless of the place of the accident or the place where the contract of hire was made, and including aliens, and minors who, for the purpose of this Act are considered the same and have the same power to contract, receive payments and give quittances therefor, as adult employees." (Ill. Rev. Stat. 1975, ch. 48, par. 138.1(b)(2).)

This court has recently concluded that the "employment relationship" test should be utilized in determining whether an employment is "principally localized" in Illinois. (*Patton v. Industrial Comm'n* (1986), 147 Ill. App. 3d 738, 744-45, 498 N.E.2d 539, 544.) In perti-

nent part, this test states:

> " 'The making of a contract within the state is usually deemed to create the relation within the state. The relation, having thus achieved a situs, retains that situs until something happens that shows clearly a transference of the relation to another state. This transfer is usually held to occur when either a new contract is made in the foreign state, or the employee acquires in the foreign state a fixed and nontemporary employment situs. \*\*\* [An employee loses his original situs] only when his regular employment becomes centralized and fixed so clearly in another state that any return to the original state would itself be only casual, incidental, and temporary by comparison.' " 147 Ill. App. 3d at 744-45, 498 N.E.2d at 543-44, quoting 4 Larson, Workmen's Compensation Law §87.42, at 16—102 through 16—104 (1986).

In *Patton*, an interstate truck driver based exclusively in Missouri but domiciled in Illinois was injured while unloading his truck in Indiana. Although claimant did an overwhelming plurality of his driving in Illinois, we concluded that the Industrial Commission's finding that the employment was not principally localized in Illinois was supported by the evidence. In doing so, we considered the following facts relevant in light of the employment relationship test: (1) the facility from which claimant received his assignments and was controlled was in Missouri; (2) claimant's source of remuneration was in Missouri; and (3) claimant worked exclusively out of the Missouri terminal and returned there upon completion of his assignments.

The facts in *Patton* are readily distinguishable from those in the instant case. In the instant case, claimant testified that the decedent, during the year prior to his death, held several business meetings in the office in their home; Paul Ochs testified to attending at least one such meeting in this office approximately two weeks prior to decedent's death. Moreover, claimant testified that she answered between five and seven business telephone calls per day on decedent's home office phone and that the decedent received business mail at his home address; Paul Ochs testified that when he wished to contact decedent he did so at decedent's home address. Ochs further testified that decedent had neither a permanent office nor secretary in Providence, Rhode Island, and that decedent received very little business correspondence there. Pursuant to the employer's acknowledgement, we note that during the year immediately prior to his death, the decedent spent more of his working time in Providence (58 days) than he did in the employer's office in South Bend, Indiana (37 days). Fur-

thermore, assuming that there are 240 working days in a year (*i.e.*, 50 working weeks of 5 days each minus 10 holidays), we conclude that the decedent spent 63 working days at the office in his home (240-177 working days during which the employer acknowledges decedent was traveling). Although the decedent's employment contract was made in Indiana, we conclude that the decedent established a fixed, nontemporary employment situs in Illinois which became so centralized and fixed that any return to Indiana was only casual, incidental, or temporary by comparison. Any other conclusion is not supported by the evidence. Accordingly, the decision of the circuit court reversing the Industrial Commission's finding that it lacked jurisdiction must be affirmed. We will now consider the merits of this case.

■ The employer contends that the Industrial Commission's determination was based upon incompetent evidence. Specifically, the employer argues that the Industrial Commission did not rule on specific objections made to the testimony of Paul Ochs and Dr. Greenberg. We note that although the employer requests that we remand this cause to the Industrial Commission for rulings on the specific objections, we can rule on these objections without benefit of such rulings.

During Paul Ochs' testimony, the employer objected to Mr. Ochs' summary of the May 3 conversation he had with decedent in which decedent related he was under pressure and concerned about losing his job. While this testimony is hearsay, and the decedent is unavailable, it falls under the then-existing mental, emotional or physical state exception to the hearsay rule. (See E. Cleary & M. Graham, Handbook of Illinois Evidence §803.4, at 554 (4th ed. 1984).) Consequently, this testimony is admissible.

The employer objected to the hypothetical question propounded to Dr. Greenberg because it allegedly referred to facts not in evidence. Specifically, these facts were (1) that decedent felt he was being "pushed out" of his job, (2) the favorable medical findings made in April 1976, (3) that on May 3 decedent told his wife that he "felt fine," and (4) that the decedent was suffering symptoms. These alleged factual inadequacies are without merit because there was competent evidence admitted in support of these facts through decedent's wife (point 3), Paul Ochs (point 1), and Dr. Obradovic (points 2 and 4). (See E. Cleary & M. Graham, Handbook of Illinois Evidence §803.4, at 554, §803.8, at 560-63 (4th ed. 1984).) Accordingly, the hypothetical question was proper.

■ When reviewing the decision of an arbitrator, the admission

of additional evidence by the Industrial Commission is a matter within its sound discretion. (*Werries v. Industrial Comm'n* (1986), 114 Ill. 2d 43, 48, 499 N.E.2d 459, 461.) Industrial Commission Rule 4—4(b)(3) limits the admission of additional evidence to evidence which "was not introduced at the arbitration hearing for good cause." In the instant case there was apparently no good cause shown for not introducing the testimony of the employer's expert witness at the arbitration hearing. The employer's assertion that "good cause" was shown because the arbitration hearing centered upon the jurisdictional issues is lame at best. Accordingly, the Industrial Commission properly refused the employer's attempt to admit additional evidence.

■ It is well established that even if an employee suffers from heart disease, if the heart attack which brings on disability or death is work related, the employee may recover workers' compensation. If there is work-related stress, either physical or emotional, that aggravates the disease so as to cause the heart attack, then there is an accidental injury or death arising out of and during the course of the employment. (See *City of Des Plaines v. Industrial Comm'n* (1983), 95 Ill. 2d 83, 88-89, 447 N.E.2d 307, 309; see also *Northern Illinois Gas Co. v. Industrial Comm'n* (1986), 148 Ill. App. 3d 48, 498 N.E.2d 327.) Although the claimant must prove that some act of employment was a causative factor, the act need not be the sole, or even the principal, causative factor. *Northern Illinois Gas Co. v. Industrial Comm'n* (1986), 148 Ill. App. 3d 48, 53, 495 N.E.2d 327, 331.

■ In the instant case, the evidence showed that while decedent had "minimal" symptoms on April 2, he developed sufficient symptoms by the end of the month to prompt his calling Dr. Obradovic. During this conversation with Dr. Obradovic, decedent stated that he was under a great deal of stress at work. Moreover, decedent told Paul Ochs on May 3 that he felt he was being "pushed out" of his job and that he was under a lot of pressure. Furthermore, Dr. Greenberg testified that based upon these facts and decedent's medical condition, he believed that the employment-related stress caused the acute myocardial infarction which caused decedent's death. We therefore conclude that the Industrial Commission's determination that the decedent's death arose out of and during the course of his employment is not contrary to the manifest weight of the evidence.

■■ ■ When considering whether one is an employee, it is necessary to consider a number of factors with evidentiary value, such as the right to control the manner in which work is done; method of

payment; right to discharge; skill required in the work to be done; who provides tools, materials, or equipment; whether the workmen's occupation is related to that of the alleged employer; and whether the alleged employer deducted withholding tax. The right to control work is the single most important of these factors. The Industrial Commission's findings after consideration of these factors will not be disturbed unless the finding is contrary to the manifest weight of the evidence. (See *Lister v. Industrial Comm'n* (1986), 149 Ill. App. 3d 286, 290, 500 N.E.2d 134, 136-37.) Although Providence Washington provided office space and supplies for the decedent and paid an allocated amount to Associates for decedent's labor, Associates paid decedent's salary, withheld taxes, had the right to discharge the decedent, and controlled where and for whom the decedent was going to work (*i.e.*, Associates allocated the time decedent spent working for its separate insurance entities). Accordingly, the Industrial Commission's determination that decedent was Associates' employee rather than Providence Washington's is not contrary to the manifest weight of the evidence. Moreover, since Associates decided which insurance companies decedent was to coordinate into the overall corporate framework, he was not a loaned employee of Providence Washington. See *Board v. Industrial Comm'n* (1986), 148 Ill. App. 3d 15, 18-19, 499 N.E.2d 90, 93.

For the foregoing reasons, the judgment of the circuit court reversing the Industrial Commission's determination that it lacked jurisdiction and confirming the Industrial Commission's subsequent determination on the merits is affirmed.

Affirmed.

BARRY, P.J., and McCULLOUGH, McNAMARA, and WOODWARD, JJ., concur.