MARATHON OIL COMPANY, Appellant, v. THE INDUSTRIAL COMMIS-SION *et al.* (Joseph Broussard, Appellee).

Fifth District (Industrial Commission Division)   No. 5—89—0738WC

Opinion filed August 22, 1990.

Gregory C. Ray, of Craig & Craig, of Mattoon, and Thomas C. Lowry, of Marathon Oil Company, of Robinson, for appellant.

Serkland & Muelhausen, of Chicago (James C. Serkland, of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Petitioner, Joseph Broussard, sought workers' compensation benefits following an injury suffered while working for respondent, Marathon Oil Company. An arbitrator awarded $344 per week for $59^6/_7$ weeks as temporary total disability benefits, and $344 per week for life as permanent total disability benefits. The Industrial Commission (Commission) modified that decision. It affirmed the award of $344 per week for $60^6/_7$ weeks as temporary total disability. However, it awarded $293.61 per week for 250 weeks after finding him permanently disabled to the extent of 50%. The trial court reversed the Commission's decision, finding it against the manifest weight of the evidence, and remanded with directions to compensate petitioner for permanent and total disability. On appeal, respondent contends that the trial court erred in holding that the Commission's finding of 50% permanent disability was against the manifest weight of the evidence.

On November 1, 1984, the 46-year-old petitioner was at work, helping move oil tanks from a truck when a 1,000-pound skid slipped off a truck, hit him on the head, knocked him to the ground and landed on his pelvis. Petitioner suffered a fractured pelvis, a sprained ankle and a cervical contusion.

Dr. Turner treated petitioner. He performed an insertion of external pelvis fixation with closed reduction of pelvic suprapubic symphysis diastasis on November 7, 1984. In February 1985, petitioner returned to work for three weeks, but testified that he could not perform the duties, and complained to his physician of tingling in his

hands when he bent his neck.

In March 1985, Dr. Turner referred petitioner to Dr. Emil Weber, a neurologist. Dr. Weber examined petitioner and diagnosed a probable spinal cord contusion associated with the accident, and with the osteoarthritic ridging and a narrowed spinal canal leading to the electricity sensation which Dr. Weber referred to as a "Lhermitte's Phenomenon." On March 28, 1985, Dr. Weber performed a laminectomy at C3, C4, C5 and C6.

On April 3, 1985, petitioner reported some improvement in the Lhermitte's Phenomenon. On June 7, 1985, petitioner reported these symptoms had ceased except when triggered by light percussion on the back of his neck in the surgical incision area. On July 28, 1985, petitioner was readmitted to the hospital for tests when the symptoms persisted. A myelogram was normal, as was a CT scan. A cervical collar relieved any further symptoms of Lhermitte's Phenomenon. On September 3, 1985, petitioner reported to Dr. Weber that the collar helped, but that he experienced intermittent parethesia to the extremities with a jolt or concussive force.

On September 3, 1985, Dr. Weber released petitioner for work, with the limitation that he not climb ladders or be in a position from which he might fall if the electric phenomenon occurred. Thus, he should not work near moving gears and belts in case he collapsed into the machinery. Petitioner did not return to work. He saw Dr. Turner again, complaining of left knee problems. On September 19, 1985, Dr. Turner performed an arthroscopic examination of petitioner's knee. Dr. Turner released petitioner for work, from an orthopedic standpoint, on October 14, 1985.

On December 26, 1985, petitioner returned to work, sweeping, mopping, waxing, dusting and carrying things. He did not climb ladders or work near machinery. Petitioner testified he could perform the janitorial duties, but continued to experience problems. On January 7, 1986, petitioner complained that the electricity sensations and numbness in his shoulder, neck and arm bothered him. On January 7, 1986, Dr. Kirkwood, the company doctor, examined petitioner and sent him back to work. Petitioner has not returned to work since that day.

On January 14, 1986, Dr. Michael Laws, a neurologist, examined petitioner. He diagnosed chronic neck pain with evidence of Lhermitte's Sign. He found an inconsistent sensory loss in the arms and legs and a decrease in flexion and extension and rotation of the neck. Dr. Laws referred petitioner back to Dr. Weber.

On February 6, 1986, petitioner told Dr. Weber that at work he was involved in vigorous physical activity such as lifting, pushing and

pulling. Dr. Weber stated that, "he felt like he could not do this kind of work, that he physically was incapable of doing it and there was no objective way I had to make an evaluation other than that." Dr. Weber believed petitioner could perform sedentary work such as stock clerk duties. Petitioner has not since returned to Dr. Weber.

Dr. Weber testified that he believed petitioner should be restricted to light duty. The Lhermitte's condition was probably permanent. Maximum healing had been reached by February 6, 1986. Since September 1985, the condition was essentially the same.

On May 7, 1986, Dr. Barry Lake Fischer examined petitioner. In an evidence deposition, Dr. Fischer opined that petitioner was not employable in any recognized branch of the labor market. The disability was due to the electric shock phenomenon, which Dr. Fischer "could obviously not objectively demonstrate during the physical examination." Petitioner also had hip and knee problems. Dr. Fischer agreed with the restrictions suggested by Dr. Weber, with the addition of no driving.

On cross-examination, Dr. Fischer testified that petitioner could perform a well tester job, depending on the question of driving and the use of tools and the weight of meters. Petitioner could perform light duty work, if consistent with his vocational capacity. Dr. Fischer did not believe that petitioner simply was not interested in returning to work.

Dr. John Gapsis testified for respondent that he examined petitioner on March 4, 1986. He found no gait abnormality or deviation. Cervical range of motion was full and complete. Neurologic examination was overall normal. Dr. Gapsis found that petitioner was not totally disabled. He opined that, "for whatever reason, this man is not interested in returning to gainful employment no matter how his job is modified or adapted to his capabilities by the employer." Petitioner would need some restrictions, but he could perform in some physical capacity.

Petitioner testified that he had a 10th-grade education. He drove his car most days. He walked frequently, and also went mushroom hunting. Each time he took a step, he felt tingling through his neck and shoulders. He could carry laundry and a few grocery bags to the house, but it bothered him. He could mow the lawn for 45 minutes to an hour, using a riding and a power mower. Petitioner could not perform the well tester job because it involved driving a pickup truck, taking meters off and using a wrench. Driving a truck could jar his neck, causing electricity to run through his body. Even when he drove his car this occurred. Petitioner also testified that his weak knee, an-

kle and hip, and the electricity phenomenon and numbness in his arms, hands, chest and neck, still troubled him.

On September 3, 1986, the arbitrator found that petitioner was temporarily totally disabled to December 26, 1985, and permanently totally disabled after that date.

In April and June 1987, the Commission heard additional evidence.

Anna Collins, an outreach worker for a community action agency, testified for respondent that petitioner had helped unload a commodity/cheese truck nine times in July, October, November and December 1986, and in January, February and April 1987. He unloaded cartons of cheese, rice, honey, milk and cornmeal. The cartons each weighed 25 to 51 pounds. Petitioner told Collins he did not care if he was observed working. Petitioner never complained of neck problems while working.

Howard Kirchoff testified for respondent that in July 1986, he was working as a private investigator and undertook a surveillance of petitioner at the request of respondent. On July 7, Kirchoff saw petitioner driving and unloading several cartloads of smashed aluminum cans from a pickup truck. On July 10, he saw petitioner driving. In December 1986, Kirchoff saw petitioner driving and apparently working under the hood of his car. On January 8, 1987, he saw petitioner unloading boxes from a truck and carrying them into a building, for 1 to 1½ hours. The bed of the truck was four feet high. Petitioner walked 25 to 30 feet into the building, and stacked boxes from four inches off the ground up to shoulder height.

Terry Reed testified for respondent that he performs personnel duties for respondent. On January 8, 1987, Reed saw petitioner unloading a cheese truck.

Fred Newman testified for respondent that he was an employee relations representative for respondent. In December 1986, Newman spoke with petitioner and John Farrell. Petitioner reported that he could not return to work on a light duty basis. On March 2, 1987, Newman spoke with petitioner, who said he knew an investigator had been following him. Petitioner admitted unloading the cheese truck, cutting wood, and riding a motorcycle. Petitioner said that he did it to "test" himself and determine his limitations.

Dr. Robert Kuhlman, an orthopedic surgeon, testified for respondent in an evidence deposition. He examined petitioner on February 9, 1987. His objective findings were largely negative and did not support a need to impose work restrictions. There was a 20-degree loss of right lateral rotation and a 10-degree loss of full flexion of the cervi-

cal spine. Petitioner had excellent strength in both hands, and no muscle atrophy was noted. Sensation was intact over both upper extremities, and his reflexes were equal and active at the level of the elbow. Dr. Kuhlman could not duplicate the electrical shocks.

Dr. Kuhlman believed petitioner appeared able to return to many types of work. Any limitations or restrictions would be related to subjective complaints in regard to the neck. He should be able to perform janitorial functions, or work involving travel by light truck or car, or work involving walking or standing for periods of 15 minutes to an hour. Petitioner should be able to do such work as mopping, sweeping, or cleaning windows, since it was quite unlikely that such activities would generate the subjective complaints petitioner made.

Certain types of manual labor might lead to problems and would put petitioner at more risk than a normal individual. However, Dr. Kuhlman saw no evidence of instability in the cervical spine. Objectively, he could find no specific reason why petitioner could not engage in work involving relatively normal activities. He should perhaps avoid violent types of jerking activities to the neck. Otherwise, his abilities would have to be determined on a trial and error basis. In regard to petitioner's subjective complaints, Dr. Kuhlman could not duplicate the symptoms upon examination.

Petitioner testified on review that he helped unload the cheese truck three or four times. The first time was in January 1987. The reason his name appeared on the list prior to that date is because his wife helped, but his name was put on the list. He only carried things that were not heavy. It was only 10 feet from the truck to the pallet where he stacked the boxes. The work bothered him quite a bit. He experienced a strain on his body, with electricity and numbness running through him. He had to go home and rest after unloading the truck.

On cross-examination, petitioner stated that he did not recall whether he unloaded the cheese truck before January 1987. In spite of the videotape taken by the investigator, petitioner refused to say whether or not the videotape showed him unloading the cheese truck. He would only say it looked like him.

Petitioner testified that when he referred to cutting grass in speaking to respondent's employees, he meant he showed his son where to start cutting, and how to turn the gas on and check the oil. It was hard for him to bend down and show his son these things. On cross-examination, petitioner testified that he partially mowed his mother-in-law's lawn in July 1986. In 1985, he cut only one to three logs and did no other wood cutting. After that, petitioner held the

wood while the neighbor cut it. Even that bothered his neck, shoulder, arm and fingers. In the fall of 1986, he stood around while his neighbor cut wood, but he denied cutting the wood himself.

Petitioner stated that no matter what activities he performed, he still had the same symptoms. He had ridden his motorcycle since the accident, but it jarred him. In 1985 he stopped riding it, on his doctor's advice. Even when petitioner performed sedentary work such as Bible study, it strained his neck, shoulder and arm. Reading and writing caused tension in his neck and arms. He could only do such work for 15 or 20 minutes at a time.

At one point, petitioner did a lot of walking, but he tired easily, his left ankle became swollen, his left hip weakened and his left knee felt weak. Up until three weeks before the June 26, 1987, testimony, petitioner had walked every evening for an hour, with four or five breaks. Petitioner stated that his pelvis feels like it is grinding. He has trouble with his neck if he rides in a car too long.

The Commission found petitioner temporarily totally disabled from the date of the accident until February 6, 1986. It found him permanently partially disabled to the extent of 50% of the man as a whole.

On October 10, 1989, the trial court reversed the Commission, finding its decision was against the manifest weight of the evidence. It found that petitioner fell into the "odd lot" category, and that respondent did not sustain the burden that shifted to it to show appropriate work was available to petitioner. The court ordered the arbitrator's award reinstated.

On appeal, respondent maintains the decision of the Commission that petitioner did not fall into the "odd lot" category was not against the manifest weight of the evidence.

■ An employee is totally and permanently disabled under workers' compensation law where he is unable to make some contribution to industry sufficient to justify payment of wages to him. (*Freeman United Coal Mining Co. v. Industrial Comm'n* (1984), 99 Ill. 2d 487, 459 N.E.2d 1368.) He must show that he is, for practical purposes, unemployable. (*Freeman United Coal Mining Co. v. Industrial Comm'n*, 99 Ill. 2d 487, 459 N.E.2d 1368.) A person need not be reduced to a state of total physical helplessness, but is totally disabled when he cannot perform services except those that are so limited in quantity, dependability or quality that there is no reasonably stable market for them. *A.M.T.C. of Illinois, Inc. v. Industrial Comm'n* (1979), 77 Ill. 2d 482, 397 N.E.2d 804.

■ The employee bears the burden of proving each element of his

case, including the extent and permanency of the injury. (*A.M.T.C. of Illinois v. Industrial Comm'n*, 77 Ill. 2d 482, 397 N.E.2d 804.) It is within the province of the Commission to determine the factual issues, to decide the weight to be given to the evidence and reasonable inferences to be drawn therefrom, and to assess the credibility of witnesses. The Commission's determination of these issues will not be set aside unless it is against the manifest weight of the evidence. *General Electric Co. v. Industrial Comm'n* (1989), 190 Ill. App. 3d 847, 546 N.E.2d 987.

Based on the medical evidence, the Commission was entitled to find that petitioner was not totally disabled. Dr. Weber prescribed limitations of no climbing ladders or working at heights where petitioner might fall if the electric phenomenon occurred. He also could not work near moving gears. While Dr. Fischer testified that petitioner was not employable, he agreed with these restrictions. Respondent's attempts to offer janitorial or office work were refused by petitioner.

Dr. Weber believed petitioner could perform sedentary work such as stock clerk duties. Dr. Kuhlman believed petitioner could perform many types of work, including some types of manual labor. The mere fact that a worker cannot perform very strenuous physical labor does not, standing alone, entitle him to an award as permanently and totally disabled. *A.M.T.C. of Illinois, Inc. v. Industrial Comm'n*, 77 Ill. 2d 482, 397 N.E.2d 804.

Thus, Drs. Kuhlman, Weber, Kirkwood, and Gapsis believed petitioner could perform various jobs, with some restrictions. Dr. Gapsis was of the opinion that petitioner simply did not wish to return to "gainful employment no matter how his job is modified or adapted to his capabilities by the employer."

The Commission could find petitioner's subjective claims of inability to perform any work not credible. No doctor was able to find objective evidence of a disability. A Back-To-Work Center which tested petitioner indicated that petitioner had the capacity to work. In addition, petitioner's statements to physical therapists and at the Center varied as to the level of pain he experienced. Moreover, when petitioner returned to work for a few weeks in December 1985, he was able to do the assigned work.

Other witnesses testified about petitioner's performing various physical activities, including riding a motorcycle, unloading a cheese truck, and cutting wood. He said he did these things to "test" himself. Petitioner told Newman he had been mowing the lawn. At the arbitration hearing, petitioner testified he could mow for 45 minutes to an hour. At the hearing before the Commission, however, petitioner

testified that he had never mowed the lawn and that his son had done it.

Petitioner testified that he could not drive a car or truck, because it jarred his neck. Yet, he also testified that he drove nearly every day. There was also contradictory testimony in regard to whether petitioner chopped wood and performed other physical activities.

In December 1986, petitioner said he had no ability to perform any function, even office work. Yet in December 1986, he had been unloading the cheese truck, which was also videotaped in January 1987. Petitioner admitted he had been unloading the cheese truck in January 1987, but refused to acknowledge that he was the person in the videotape. He initially stated the first time he unloaded the truck was in January 1987, but then testified that he could not recall. Petitioner testified he carried nothing heavy, but Collins testified the cartons weighed 25 to 51 pounds each. Petitioner testified that the work bothered him quite a bit, but Collins testified petitioner never complained of neck problems while working.

■ The trial court erred when it found the Commission's decision was against the manifest weight of the evidence. We hold that the evidence amply supports the Commission's determination that petitioner suffered a permanent disability of 50% of the man as a whole. We remand the case with directions to reinstate the Commission's decision.

For the foregoing reasons, the judgment of the circuit court of Lawrence County is reversed, and the cause is remanded with directions.

Judgment reversed and remanded.

BARRY, P.J., and WOODWARD, McCULLOUGH, and LEWIS, JJ., concur.