INGERSOLL MILLING MACHINE COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION et al. (Bonita Boatman, Widow of Dennis Boatman, Deceased, and as Representative of Decedent's Dependents, Appellee).

Second District (Industrial Commission Division)   No. 2—92—1102WC

Opinion filed November 23, 1993.

Jeffrey L. Salisbury, of Picha & Salisbury, of Rockford, for appellant.

William T. Cacciatore, of Bruscato & Cacciatore, of Rockford, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Claimant, Bonita Boatman, widow of decedent, Dennis Boatman, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1981, ch. 48, par. 138.1 *et seq.*). Therein she alleged that decedent had sustained a heart attack on April 13, 1982, while working for the employer, Ingersoll Milling Machine Company. After a hearing held on August 17, 1988, the arbitrator denied compensation. Upon review, the Industrial Commission (Commission) reversed the arbitrator, finding that decedent's heart attack was work related. The circuit court of Winnebago County confirmed the Commission's decision, and this timely appeal followed.

On appeal, the employer raises two arguments, namely, that claimant failed to prove that decedent suffered a myocardial infarction and that claimant failed to prove that decedent was exposed to unusual mental or emotional stress arising out of and in the course of his employment.

At the arbitration hearing, the following evidence was adduced. Dennis Hollingsworth, a former electrical field service representative for the employer, testified for the claimant as to the general duties of a field service representative (representative), the position held by decedent at the time of his death. Mr. Hollingsworth worked for several months with the decedent in 1981 on a job in Seattle, Washington. He stated that the representative's task was to install special machinery for customers at their places of business. Representatives installed machinery all over the United States. The job typically involved unloading as many as 150 crates, sorting and organizing the parts, and advising the customer how to assemble the machine.

Mr. Hollingsworth testified that a representative would normally work 55 to 68 hours per week and would spend about 26 days of every month away from home. Living away from home most of each month put considerable strain on the representative's family relationships. For example, holidays, birthdays and other special occasions were often missed. Representatives often had to deal with unrealistic goals and deadlines, of both the employer and customers. Sometimes machines were delivered incomplete, did not match expectations, or could not be tested properly in the field. These problems caused additional stress for representatives.

Gaylon Idecker testified for claimant via an evidence deposition. He was employed by Alcoa as a senior staff mechanical engineer. As such, Mr. Idecker served as the project engineer for the installation of a "scalper" machine manufactured by the employer. In that capacity, he worked closely with the decedent, who was the employer's representative at the Alcoa site located in Davenport, Iowa. Decedent began on the Alcoa job in January 1982, and he was directly involved in all of the problems with parts, equipment, scheduling, personnel and start-up of the machine.

The scalper mills the top and bottom surfaces of aluminum ingots. It is three stories high, 25 to 30 feet wide and 75 feet long. The scalper had been scheduled to begin actual trial runs by December 7, 1981, but a major failure of the machine's spindle coupling required months of redesigning. There was also a major problem in the machine's load control. Decedent coordinated the efforts of the electrical servicemen to repair that problem and others that arose. Decedent told Mr. Idecker that "his electrical servicemen were very frustrated in working on the problems. At times, they did not want to return to work the next day. They were fed up, so to speak, tired of working on the problems, the pressure was too great."

Mr. Idecker also testified that decedent worked very hard and was committed to doing a good job for Alcoa. At times, decedent expressed to him the pressures and frustrations he was experiencing while attempting to solve the problems of installing the scalper. According to Mr. Idecker, there was an enormous amount of pressure to get the equipment operating correctly. Several of the employer's electrical servicemen assigned to the Alcoa project had left the project due to pressure. Mr. Idecker also was being pressured by Alcoa to get the scalper up and running and decedent, on occasion, stated that he was "getting a lot of pressure from the people back at Rockford on getting the problems resolved." The scalper was not operational until May 1982, long after it was scheduled to be on line.

Mr. Idecker further testified that it was not unusual to have start-up difficulties with this type of large machine. However, he stated that the design problems with the instant scalper went beyond the usual. He did not notice anything out of the ordinary about the decedent on April 13, 1982, except that he was excited about having his wife and children come to Davenport that night. Mr. Idecker recalled nothing unusual about work on the scalper that day, nor did he recollect noticing that decedent was experiencing any physical problems while at work.

Claimant testified that she married decedent in 1975. It was the second marriage for both of them. Each had four children from the previous marriage, and they had one child from their marriage. Decedent worked for the employer from 1978 until his death on April 13, 1982. He was away from home most of the time due to work and normally came home only every other weekend. On the Alcoa job, he came home every weekend due to the proximity of Davenport to their Rockford residence. Claimant stated that decedent smoked cigarettes and would smoke a pack while home on a weekend. While working at the Alcoa site, decedent normally left at 4 a.m. each Monday morning and returned late on the following Friday evening. During the course of their marriage, decedent, due to his job, had missed numerous birthdays, anniversaries, a baptism, two first communions, a confirmation and many basketball and baseball games. He was also away during claimant's surgery.

Claimant testified that, when she first saw decedent on the evening of Tuesday, April 13, 1982, he had driven from Davenport to Rockford. He was very pale and tired. Decedent, claimant and three of their children then drove back to Davenport, so that he could be at work early the next morning. It was the children's spring break,

and decedent wanted to spend the next several evenings in Davenport with his family. After the family arrived at the Davenport motel at about 9:30 p.m., claimant noticed again that decedent was very pale. Shortly thereafter, decedent came out of the bathroom and looked "really white." At that time, decedent stated, "I am just really tired. I've been under alot [*sic*] of stress lately." Further decedent told claimant that he "kept having this awful pain in [my] chest." Claimant then asked him how long he had noticed this pain, and decedent replied, "[F]or a couple of weeks now."

Decedent then lay down on the bed. Claimant asked him if he felt any better. Decedent stated that he felt as if something was sitting on his chest. Decedent also said that he had not felt this way before. At about 10:10 p.m., claimant kissed decedent on the forehead; she noticed that his skin was cold and sweaty. She left the room for a few minutes and upon returning, found her husband unconscious. She called for paramedics, who transported the decedent to Davenport's Mercy Hospital. Hospital records indicated that decedent was dead on arrival.

The death certificate, which was admitted into evidence, listed as causes of death: (a) cardiopulmonary arrest and (b) probable acute myocardial infarction. It was signed by Dr. Alan D. Heberer of Mercy Hospital.

Also admitted into evidence was the evidence deposition of Dr. Nathaniel Greenberg. Dr. Greenberg testified that, although no autopsy had been performed, he could reach a conclusion, based upon a reasonable degree of medical and surgical certainty, that the decedent died as a result of a myocardial infarction. Dr. Greenberg stated that, based upon symptoms described and the stress that the decedent had been undergoing, it was reasonable to state myocardial infarction as the cause of death. The fact that the decedent felt cold and clammy, that he had been complaining of chest pains in the weeks before his death, and that he felt as if something was sitting on his chest immediately prior to his death fortified his conclusion that decedent had sustained a myocardial infarction.

John Martin testified on the employer's behalf. An installation manager for the employer since 1965, he stated that the job of field service representative inherently involves problems and problem solving because of the size of machines that are installed. Decedent was sent to Alcoa's Davenport facility to assist Alcoa in getting the scalper up and running and into full-scale production. Decedent started at the Alcoa project site on February 22, 1982, and Mr. Martin spoke with him every day by telephone. As of April 12,

1982, the machine was installed and in a trial-run process. Mr. Martin was aware of nothing unusual regarding the installation of the scalper during the first weeks of April 1982. He described decedent as hard-working and dutiful, and he had no criticism of the job decedent was doing at the Alcoa site.

The employer first argues that the Commission's decision that decedent suffered a myocardial infarction was against the manifest weight of the evidence. The employer contends there are no facts which support the Commission's determination. It maintains that Dr. Greenberg's opinion that decedent had suffered a myocardial infarction amounts to mere speculation. Moreover, the employer argues that the lack of an autopsy further erodes the Commission's finding.

Claimant asserts that there is sufficient evidence to support a decision that decedent had suffered a myocardial infarction. She points to her own testimony concerning the symptoms evident immediately before the decedent's death, as well as decedent's statement that he had been experiencing chest pains in the week prior to April 13, 1982. This testimony was critical to the opinion of Dr. Greenberg, who found that decedent's symptoms before his death most likely reflected a substantial death of the heart muscle (myocardial infarction). Claimant further argues that the lack of an autopsy does not render as speculative all opinions concerning the conditions which led to the instant death.

■■ It is the Commission's province to judge the credibility of witnesses, to draw reasonable inferences from the testimony, and to determine what weight the testimony is to be given. (*Paganelis v. Industrial Comm'n* (1989), 132 Ill. 2d 468, 483, 548 N.E.2d 1033, 1040.) Further, it is the Commission's province to resolve conflicts in medical evidence. (*Amoco Oil Co. v. Industrial Comm'n* (1991), 218 Ill. App. 3d 737, 747, 578 N.E.2d 1043, 1050.) The Commission's decision on a question of fact will not be disturbed unless it is contrary to the manifest weight of the evidence. *Paganelis*, 132 Ill. 2d at 484, 548 N.E.2d at 1040.

■■ We do not agree with the employer's contention that no facts were presented which support the Commission's finding. Of primary importance is claimant's testimony. On the evening of April 13, 1982, she noticed that decedent was extremely pale and tired. Right before his death, his skin was cold and sweaty. Decedent spoke to her of having had chest pains in the prior several weeks. He told her that he felt as if something heavy was sitting on his chest, a pain that was stronger than he had previously experienced.

Dr. Greenberg justifiably relied in part upon claimant's testimony in determining that, immediately prior to his death, decedent was exhibiting symptoms of a myocardial infarction.

Lending further support to the Commission's finding is the death certificate admitted into evidence, with no objection by the employer. Dr. Heberer, the attending physician at Mercy Hospital's emergency room, stated without qualification that the cause of death was cardiopulmonary arrest, which was due to *probable* acute myocardial infarction. This opinion, which was based in large part upon statements made by claimant to the hospital staff, serves to buttress the Commission's conclusion.

In contrast, we do not find the employer's reliance on Dr. William Barnhart's report particularly compelling. Dr. Barnhart, who completed his report on May 26, 1988, did not have the benefit of critical testimonial evidence presented at the arbitration hearing held on August 17, 1988. As such, he had no familiarity with the testimony of claimant, Dennis Hollingsworth or Gaylon Idecker, whose testimony was specifically referred to by the Commission. Dr. Barnhart states cryptically that decedent's "work record and job description" had been outlined for him. We have no way of knowing if the employer fully apprised Dr. Barnhart of decedent's working conditions or if he merely relied on a superficial job description. Similarly, his reference to reviewing the Mercy Hospital emergency room records leaves considerable doubt as to how extensive his knowledge was of decedent's symptoms prior to his death. Because of these uncertainties regarding how much knowledge Dr. Barnhart had of the relevant evidence, we are not prepared to rely upon his opinion in this matter.

Moreover, we do not find the lack of an autopsy to be of crucial significance here. Certainly, an autopsy would have been useful in determining the exact cause of death. Yet, there is a sufficient record of decedent's symptoms prior to his death to permit reasonable inferences regarding the cause of death. Further, we note that an autopsy is not an automatic procedure after all deaths. There are a variety of reasons, too numerous to describe here, as to why autopsies are not performed in all cases. The lack of such a procedure cannot serve as a primary basis for denying compensation, especially where, as here, there is substantial evidence regarding decedent's fatal condition.

We find the employer's emphasis upon *Benson v. Industrial Comm'n* (1982), 91 Ill. 2d 445, 400 N.E.2d 90, is misplaced. In *Benson*, where no autopsy was performed, the 55-year-old decedent

sat on a stool, scrubbing some discs. With no warning, he fell to the floor and died. The *Benson* decedent had described no physical symptoms which would have explained his death. Also, the decedent had some other medical conditions which, without an autopsy, could not effectively be ruled out as the probable cause of death. In the instant case, decedent had, in the hour immediately preceding his death, exhibited specific symptoms related to a heart condition. Also, there was no evidence that this decedent had any other medical conditions, which could not be ruled out as causes of death without an autopsy.

Based on the record before us, the Commission's conclusion that decedent suffered a myocardial infarction is not against the manifest weight of the evidence.

■ The employer's final argument is that the Commission erred in finding that decedent's myocardial infarction was caused by mental or emotional stress arising out of and in the course of his employment. The employer maintains that decedent was under no extraordinary stress while overseeing the effort to get the scalper on line. The employer attempts to characterize both Alcoa and Ingersoll as parties simply interested in the progress of installing the scalper, rather than as business entities pressing for the project's completion.

Claimant argues that the record is replete with evidence of the extraordinary pressure upon decedent to finish the scalper's installation and the effect such stress was having on him.

It is axiomatic that the Commission's determination as to causation will not be disturbed on review unless it is against the manifest weight of the evidence. (*Horath v. Industrial Comm'n* (1983), 96 Ill. 2d 349, 449 N.E.2d 1345.) While claimant must prove that some act of employment was a causative factor, the act need not be the sole, or even the principal, causative factor. (*Wheelan Funeral Home v. Industrial Comm'n* (1991), 208 Ill. App. 3d 832, 567 N.E.2d 662.) If work-related stress aggravates or accelerates claimant's heart condition so as to cause a heart attack, the heart attack is an accidental occurrence arising out of and in the course of employment, unless the employee's condition was so poor that any activity would constitute an overexertion. *Cognato v. Industrial Comm'n* (1993), 242 Ill. App. 3d 50, 609 N.E.2d 783.

Contrary to the employer's contentions, the evidence before us describes intensely stressful work conditions encountered by decedent. Dennis Hollingsworth generally described the work life of a representative, who was normally away from home 26 days out of

each month. Those representatives with families experienced substantial problems in maintaining any semblance of normal family life. Mr. Hollingsworth testified that representatives often had to deal with unrealistic goals and deadlines, which caused stress and strain upon them.

Regarding the Alcoa project, the Commission placed particular emphasis upon the testimony of Gaylon Idecker, Alcoa's project coordinator. Prior to decedent's arrival at Davenport, a number of major problems had pushed back the scalper's completion date, which was originally scheduled for December 1981. Mr. Idecker stated there were design problems which "were beyond the usual. These were unusual design problems you would not expect from a first-class machine builder like Ingersoll." His testimony demonstrates that decedent inherited a very complex task, which was full of problems and running far behind schedule. Mr. Idecker testified that on numerous occasions decedent had related to him how frustrated the employer's service representatives were becoming, due to installation problems. Decedent also spoke of his own frustrations with the difficulties posed by the Alcoa project.

According to Mr. Idecker, there was an enormous amount of pressure to get the scalper on line. He personally was being pressured by Alcoa to get the machine running, and decedent told him on numerous occasions about "getting a lot of pressure from the people back at Rockford on getting the problems resolved." A couple of Ingersoll's electrical servicemen had left the project due to this pressure.

Mr. Idecker stated that claimant often worked on Saturdays and was usually at the plant from 7 a.m. to 5 or 6 p.m. on weekdays. On occasion, decedent would drive back to Rockford after work in order to pick up and deliver parts to be used the following day. Decedent told Mr. Idecker that he often talked with other Ingersoll employees at their hotel after work about ways to solve the installation problems.

Dr. Greenberg testified that there was a causal relationship between decedent's employment and subsequent death. He also testified that the job stresses encountered by decedent were significantly greater than those encountered by the average person and that there were a number of elements of the decedent's job which placed additional stress upon him. He opined that some of these stresses were the result of decedent being away from home for prolonged periods, the pressures to get the jobs completed, and decedent's extensive supervisory responsibilities. Dr. Greenberg con-

cluded "[t]hat the work circumstances contributed in a significant manner to the deterioration of his circulation that eventuated in a fatal heart attack on April 13th."

We do not find the testimony of John Martin persuasive. His attempts to portray the frustrations caused by the Alcoa job and the problems experienced therein as normal are not convincing. Instead, the bulk of the evidence demonstrates that decedent was faced with a very stressful and frustrating task in overseeing the scalper's installation.

Similarly, the opinion of Dr. Barnhart that there was no causal connection between decedent's employment and his death carries little weight here. As was discussed above, Dr. Barnhart gave his opinion without the benefit of the testimony of claimant and Gaylon Idecker, in particular. He had little foundation upon which to give his opinion as to causal connection.

Finally, the employer's reliance on *Esco Corp. v. Industrial Comm'n* (1988), 169 Ill. App. 3d 376, 523 N.E.2d 589, is not well placed. In *Esco*, which is factually dissimilar from the appeal at bar, claimant suffered a heart attack five months after being discharged. The *Esco* claimant suffered a heart attack after playing 18 holes of golf. Here, the decedent was deeply involved in a stressful attempt to bring a problem-ridden, long-delayed project to completion.

Based upon the testimony of Mr. Idecker and Dr. Greenberg, we find that the Commission's decision regarding causal connection is not against the manifest weight of the evidence.

For reasons stated above, we affirm the judgment of the circuit court.

Affirmed.

McCULLOUGH, P.J., and RAKOWSKI, SLATER, and RARICK, JJ., concur.