THE CITY OF WAUKEGAN, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Edwin Herner, Appellee).

Second District (Industrial Commission Division) No. 2—97—0750WC

Opinion filed August 12, 1998.—Rehearing denied September 18, 1998.

RAKOWSKI, J., dissenting, joined by McCULLOUGH, P.J.

David F. Pardys, of Wildman, Harrold, Allen & Dixon, of Waukegan, for appellant.

Thomas D. Campe, Jr., of Decker & Linn, Ltd., of Waukegan, for appellee.

JUSTICE RARICK delivered the opinion of the court:

Claimant, Edwin Herner, sought benefits pursuant to the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1991, ch. 48, par. 138.1 *et seq.*) for injuries arising out of and in the course of his employment with the City of Waukegan (employer). The arbitrator awarded claimant permanent total disability benefits. On appeal, the Industrial Commission (Commission) affirmed the arbitrator's decision, and the circuit court of Lake County confirmed the Commission's decision. Employer appeals, contending the finding of accidental injury arising out of and in the course of employment is contrary to the manifest weight of the evidence and contrary to the law. Employer also takes issue with the finding of permanent, total disability. We affirm.

Claimant began working as a police officer for employer in January 1971. Over the years claimant was promoted several times and served as shift commander for the department from 1985 to 1990. In 1990, claimant was again promoted to the position of commanding officer of community services.

On November 5, 1991, claimant awoke at 6 a.m. with a burning sensation in his stomach. He had not slept well the night before and was extremely nervous and upset about a meeting he was to have that day with his supervisors. While driving to work, claimant noticed he began to sweat profusely and to feel pain going up his left arm and into his left elbow. He also began to feel pressure in his chest and heart palpitations. Claimant turned around and went back home. Because he was feeling worse once he arrived home, he called for emergency assistance. Claimant was transported to the St. Therese Medical Center Emergency Room by the rescue squad where he was diagnosed as having suffered a cardiac infarction, or heart attack. On November 6, 1991, claimant was transferred to St. Luke's Medical Center, where cardiac catheterization was performed. Subsequent to his discharge, claimant has remained under doctor's care. He continues to have a very low heart ejection fraction of 20% to 25%, which requires permanent Coumadin treatment. The Social Security standard rates those individuals with less than 30% ejection fraction as completely disabled. Claimant has not worked since the heart attack.

Other evidence revealed that claimant has never smoked and does not consume alcohol. Both of his parents lived long lives, his father dying at the age of 86 and his mother at 76. His mother did die of a heart attack, however, as did his sister at the age of 59.

Claimant first began treatment for high blood pressure in 1979 or 1980. In 1984 he began seeing Dr. James Monahan, who is board certi-

fied in internal medicine and in the subspecialty of cardiovascular disease. During his first visit with Dr. Monahan, claimant complained of chest pain and aching arms and commented that he was under a lot of stress both at work and home. Dr. Monahan testified that claimant is the type of individual who reacts physiologically to stress more than most people do. Work-related stress was a constant theme throughout the doctor's records and conversations with claimant. For instance, as shift commander, claimant was responsible for all police officers on that shift (approximately 20 to 30 officers) and for any type of investigation and whatever else happened in the city during that shift. As such, his job involved many stressful and adversarial situations with the public and aldermen, and he was subjected to much "second-guessing" by his supervisors. It was claimant's responsibility to appease the public and to defuse any tense situations that occurred on his shift of command. Claimant testified that as time progressed he found it more difficult to put the confrontations behind him. He began to sleep poorly and noticed his heart beating rapidly and his stomach getting upset. He would become sweaty and would feel extremely anxious and frustrated. As commanding officer of the community service division, claimant was often called to mediate confrontational situations with the public and the city. He was also responsible for the training of all officers. Claimant testified that in 1991 the stress-related feelings were becoming an everyday occurrence. By the fall claimant noticed he was in constant dread of confrontations and was losing a lot of sleep. Claimant further testified that weeks before the heart attack the firing range broke down and was totally unusable. Claimant was responsible for the maintenance and upkeep of the firing range as part of the officers' training and had to work with his supervisors to get expensive repairs made. The supervisors were not willing to make the recommended repairs and agreed to do only what was necessary to get by. The day before claimant's heart attack, the range broke down again. Claimant was not able to have it repaired by the end of the workday on November 4, and claimant knew the morning of his heart attack he was going to have to "bump heads" with someone over the proper repair of the firing range. Dr. Monahan concluded that claimant's work-related stress caused his heart attack and that he was permanently disabled. Several examining doctors reached the same conclusion.

Dr. Nathaniel Greenberg, who examined claimant on April 22, 1993, diagnosed claimant's condition as being "acute myocardial infarction with residual myocardial insufficiency." Dr. Greenberg specifically noted in his report that claimant was subjected to prolonged and substantial occupation stress which accelerated the

atherosclerotic process. Dr. Greenberg noted this was all the more significant in claimant because of "the relative absence of other major risk factors." Dr. Greenberg concluded claimant could only return to the very lightest occupation and that even a sedentary job would have to be free of significant stress for claimant to cope with it. Employer's expert, Dr. Fintel, also concluded claimant's condition was permanent but opined it resulted from hereditary causes and long-standing health problems.

■ Whether an injury arises out of and in the course of employment is a question of fact. *Wheelan Funeral Home v. Industrial Comm'n*, 208 Ill. App. 3d 832, 836, 567 N.E.2d 662, 665 (1991). It is the function of the Commission to determine the facts, judge the credibility of the witnesses, and draw reasonable inferences from competent evidence. *Ingersoll Milling Machine Co. v. Industrial Comm'n*, 253 Ill. App. 3d 462, 467, 624 N.E.2d 829, 833 (1993); *Wheelan*, 208 Ill. App. 3d at 836, 567 N.E.2d at 665; *Marathon Oil Co. v. Industrial Comm'n*, 203 Ill. App. 3d 809, 816, 561 N.E.2d 141, 146 (1990). It is also the Commission's province to resolve conflicts in medical evidence. *Ingersoll*, 253 Ill. App. 3d at 467, 624 N.E.2d at 833. We, as a reviewing court, will not disturb the findings of the Commission unless such findings are contrary to the manifest weight of the evidence. *Ingersoll*, 253 Ill. App. 3d at 467, 624 N.E.2d at 833; *Wheelan*, 208 Ill. App. 3d at 836, 567 N.E.2d at 665. We cannot say in this instance the findings of the Commission are against the manifest weight of the evidence.

■ It is well established that an employer takes its employees as it finds them (*County of Cook v. Industrial Comm'n*, 69 Ill. 2d 10, 17, 370 N.E.2d 520, 523 (1977)) and that, even if an employee suffers from heart disease, if the heart attack which brings on disability or death is work related the employee may recover workers' compensation (*Wheelan*, 208 Ill. App. 3d at 836, 567 N.E.2d at 665; *Associates Corp. of North America v. Industrial Comm'n*, 167 Ill. App. 3d 988, 996, 522 N.E.2d 102, 108 (1988)). If there is work-related stress, either physical or emotional, that aggravates the disease so as to cause the heart attack, then there is an accidental injury or death arising out of and in the course of the employment. *Wheelan*, 208 Ill. App. 3d at 836, 567 N.E.2d at 665; *Associates*, 167 Ill. App. 3d at 996, 522 N.E.2d at 108. While the claimant must prove that some act of employment was a causative factor, the act need not be the sole, or even the principal, causative factor. *Ingersoll*, 253 Ill. App. 3d at 469, 624 N.E.2d at 834; *Wheelan*, 208 Ill. App. 3d at 836, 567 N.E.2d at 665.

■ The Commission concluded the heart attack claimant suffered on November 5, 1991, was an accidental injury that arose out of and

in the course of claimant's employment. The majority of the medical testimony supports this finding of causal connection. Dr. Monahan, claimant's treating physician, explained that claimant was the type of person who reacted physiologically to stress. He noted that work-related stress was a recurrent theme throughout his records of treatment of claimant over many years. The combination of claimant's work as a police officer and claimant's nature in general led to the development of premature coronary disease and caused the heart attack that followed. Dr. Greenberg also concluded the prolonged and substantial occupational stress that claimant was subjected to accelerated the atherosclerotic process to the point of causing the November heart attack. Claimant testified his condition was getting progressively worse. He had more and more difficulty putting confrontations behind him. He was sleeping poorly, his stomach was getting upset regularly, and he was becoming extremely anxious and frustrated. The day before his heart attack, the firing range, an item for which claimant was responsible, broke down again after costly repairs a few weeks earlier. The range still was not functioning at the end of the day, and claimant knew he was going to have to "bump heads" over the matter with his supervisors the next morning. Claimant slept poorly that night and began dreading the confrontation while driving into work the next morning. The stress was too great, resulting in claimant's suffering a heart attack. Although there was some history of heart disease in his family, claimant had few other major risk factors. The major factor for claimant was occupational stress. Given such circumstances, we cannot say the Commission erred in finding a direct connection between claimant's work activities and his heart attack.

The Commission also concluded claimant was totally and permanently disabled as a result of his work-related heart attack. Again we cannot say such a conclusion is against the manifest weight of the evidence. An employee is totally and permanently disabled when he cannot perform services except those that are so limited in quantity, dependability, or quality that there is no reasonably stable market for them. *Marathon Oil*, 203 Ill. App. 3d at 815, 561 N.E.2d at 146. Claimant clearly falls within this category. Claimant sustained severe and permanent damage to his heart as a result of the November 5 heart attack. After the attack, claimant's heart had only a 20% to 25% ejection fraction. The Social Security standard rates those individuals with less than 30% ejection fraction as completely disabled. Dr. Monahan testified such a low ejection fraction was dangerous because claimant had no cardiac reserve. If the body required an increased cardiac output, claimant would not be able to bring it up and would likely die. Dr. Monahan therefore concluded claimant could

not return to any type of work. Dr. Greenberg also reached the same conclusion and further noted that even a sedentary job would have to be free of stress for claimant to cope with it. Understandably, claimant has few marketable job skills given his long history with the police department, his reliance on medication, and the nature of the severe and permanent damage to his heart. Accordingly, we cannot say the Commission's determination of total and permanent disability is in error in this instance.

We affirm the decision of the Industrial Commission as confirmed by the circuit court of Lake County.

Affirmed.

COLWELL and HOLDRIDGE, JJ., concur.

JUSTICE RAKOWSKI, dissenting:

Claimant bears the burden of establishing that the heart attack arose out of and in the course of his employment. *Vesco Ventilation & Equipment Sales v. Industrial Comm'n*, 168 Ill. App. 3d 959, 964 (1988). It is axiomatic that within this burden of proof there are two elements that must be shown. Whether claimant sustained his heart attack during the course of his employment depends upon the time, place, and circumstances under which the accident occurred. *Esco Corp. v. Industrial Comm'n*, 169 Ill. App. 3d 376, 382 (1988).

The second element, whether claimant's heart attack arose out of his employment, requires proof of a causal connection between claimant's employment and the attack. *Esco*, 169 Ill. App. 3d at 383. "The risk of injury must be peculiar to the work such that the employee is exposed to it to a greater degree than the general public by reason of the employment." *Esco*, 169 Ill. App. 3d at 383.

For work-related stress to be a causative factor leading to a heart attack, such stress must have been "unusual." One factor to consider in determining "unusualness" is whether the stress subjected the employee to a greater emotional strain than that to which all employees are subjected. *Esco*, 169 Ill. App. 3d at 383. Another factor to consider is whether the stress was "unusual" when compared to the strain of the claimant's normal working conditions. *Esco*, 169 Ill. App. 3d at 383; 2 A. Larson & L. Larson, Larson's Workers' Compensation Laws § 38.65(d)(4)(i), at 7—297 (1997).

In the instant case, there is no evidence to suggest that claimant's job put him at risk of heart attack to a greater degree than the general public. Claimant was a shift commander for the Waukegan police department, which entailed supervising 20 to 30 officers. He also states

that it was his job to appease the public and to defuse situations that occurred on his shift of command. Although claimant states that these situations were "stressful" and "adversarial," he did not elaborate on the frequency or nature of these situations. Claimant also testified that he was subject to "second-guessing" by his supervisors.

I respectfully submit that the above in no way establishes that claimant was subject to a greater risk of stress and/or heart attack than the general public. His job was routine and the situations he described were situations that anyone engaged in police work would be subjected to on a daily basis. On a scale of 1 to 10, claimant's job was at best a two when compared to the stress that most Americans are exposed to at the work place on a daily basis.

Nor is there any evidence that the stress claimant was exposed to was unusual. The only evidence claimant offers is that a firing range had broken down and that his supervisors were not willing to make the recommended repairs. Is this the type of "unusualness" that can be said to subject an employee to greater emotional strain than that to which all employees are subjected? Can it be said to be "unusual" when compared to the stress of claimant's own normal conditions? I respectfully submit that the answer is no.

Based on the foregoing, it is clear that claimant's employment did not subject him to a risk of heart attack greater than that to which the general public is exposed. The decision of the Commission is clearly against the manifest weight of the evidence, and an opposite conclusion is clearly apparent.

McCULLOUGH, P.J., joins in this dissent.